**UNITED STATES, Appellee,**

v.

**Maria VALERIO, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Domingo BAEZ, Defendant, Appellant.**

Nos. 94–1708, 94–1709.

United States Court of Appeals, First Circuit.

Heard Feb. 9, 1994.

Decided Feb. 27, 1995.

**60**

William T. Murphy, for appellant Maria Valerio.

Ernest J. Barone, for appellant Domingo Baez.

Lawrence D. Gaynor, Asst. U.S. Atty., with whom Sheldon Whitehouse, U.S. Atty., was on brief for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

Following a five-day jury trial, defendants-appellants Domingo Baez and Maria Valerio were convicted of possession of cocaine with intent to distribute and conspiracy to commit the same offense. Baez also was convicted of being an illegal alien in possession of a firearm. Baez challenges his convictions, asserting that he was deprived of a fair trial because of (1) the district court's failure to hold an *in camera* hearing to determine the truthfulness of a search warrant affidavit; and (2) a duplicitous count in his indictment. Valerio also challenges her convictions, contending that the evidence was insufficient to support them. After carefully reading the record and considering the parties' arguments, we affirm Baez's convictions and reverse Valerio's.

*I.*

*A. Background Facts*

Because this case involves a challenge to criminal convictions, we interpret the evidence in the light most amenable to the government. *See United States v. Ortiz,* 23 F.3d 21, 23 (1st Cir.1994).

Prior to July 21, 1993, Providence Police Detective Stanley Nadrowski, pursuant to an on-going investigation, led a police team that conducted several surveillances of apartment buildings at 165 Peace Street, Providence, Rhode Island, and 49 Marden Street, Cranston, Rhode Island. The team also surveilled a gray Chevrolet with Rhode Island license plate YC–243, which was seen at both addresses.

At approximately 7:00 p.m. on July 21, 1993, in the course of one of these surveillances, Nadrowski noticed Baez leave 165 Peace Street, enter the gray Chevrolet, and drive off. Nadrowski and several other members of the surveillance team followed Baez to 49 Marden Street, which they saw him enter. Subsequently, the police officers observed Baez exit the building and drive onto Route 10. They followed him into Providence, where he turned onto Westminster Street. At this point, the police stopped him. Baez got out of his vehicle and dropped a plastic bag containing 13.9 grams of cocaine to the ground. The police then arrested him. In Baez's right front pants pocket, the officers found a set of keys containing keys to 165 Peace Street and 49 Marden Street. One of the keys was labeled "49 Marden Street # 7."

At the time of Baez's arrest, the police had already obtained a search warrant for 165 Peace Street. After his arrest, the police also obtained a warrant for Apartment 7 at 49 Marden Street. The Marden Street warrant was executed first, and the search of those premises led to the discovery of 515.6 grams of cocaine, along with a Tanita scale of the type used to weigh narcotics. The cocaine was found in a Brillo box underneath a nightstand in the bedroom; on top of an adjoining bureau was a picture of Baez.

After the search of 49 Marden Street, the police executed the search warrant for the first floor right apartment at 165 Peace Street. Valerio and a baby were present in the apartment at the time the search was executed. Nadrowski searched the only bedroom in the apartment, and found men's and

women's clothing, two pairs of Baez's shorts, photo albums containing pictures of Baez and Valerio, a woman's flowered purse, identification cards and rent receipts in Valerio's name, a child's health records to which Valerio's name was affixed, and a bassinet. He and the other officers also found 73.24 grams of cocaine and an operable, unloaded .357 handgun. Most of the cocaine was found in the lining under the seat cushion of a chair next to the bed; 14.83 grams of it, however, were found inside a baby's shoe, which was on a bedroom shelf. The gun was next to the cocaine in the chair lining. At the conclusion of this search, Valerio was arrested.

At trial, the landlord of 165 Peace Street testified that Baez had rented the apartment in April, 1993, and that Baez had requested that the rent receipts be issued in the name of Maria Valerio. The receipts bearing Valerio's name were introduced with a cautionary instruction from the court that they could be considered in connection with Baez's case, but not Valerio's. The landlord testified that he saw Baez two or three times between April, 1993 and the day of the arrest. He also testified that he had never seen Valerio before the night of her arrest. This testimony was consistent with Baez's testimony that Valerio was not a long-term occupant of the apartment, but had been visiting him from New York for the two or three days prior to her arrest.

### B. Proceedings Below

On November 9, 1993, Baez and Valerio were arraigned on a superseding, three-count indictment. Count I charged them with conspiracy to distribute and possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846; Count II charged them with the underlying offense of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); Count III charged them with being illegal aliens in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5).

The defendants moved to suppress the cocaine and firearm that were the subject of the superseding indictment. The district court denied the motion. Subsequently, Baez renewed his suppression request, alleging for the first time that the affidavits submitted in support of the search warrants were false. He accordingly requested a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (summarizing showing a defendant must make to be entitled to a hearing on the adequacy of a warrant affidavit). On January 28, 1994, the court granted the motion for a *Franks* hearing and held a portion of it. On February 3, 1994, the court concluded the hearing and denied Baez's motion to suppress. At that same time, the court stated on the record that it had been a mistake to grant Baez a *Franks* hearing in the first place.

On February 16, 1994, trial began. Prior to trial, the government moved to dismiss Count III of the indictment against Valerio. The district court granted the motion. On March 1, 1994, the jury found Baez guilty on all three counts of the indictment and found Valerio guilty on Counts I and II. On June 17, 1994, the district court sentenced Baez to 121 months in prison, five years of supervised release, and $150 in special assessments. That same day, the court sentenced Valerio to 13 months in prison, five years of supervised release, and $100 in special assessments. The court also ordered the defendants presented for deportation as a condition of their supervised release. This appeal followed.

### II.

### Baez's Appeal

Baez makes two arguments on appeal. First, he contends that the district court erred in declining his request, made at the conclusion of the *Franks* hearing, to conduct an *in camera* proceeding at which the court would ask the search warrant affiant submitted questions designed to impeach the affiant's credibility. Second, he claims that Count II of the superseding indictment was duplicitous. It is Baez's position that the error regarding the *in camera* hearing requires that we set aside all three of his convictions, and that the duplicitous count in the indictment requires that we set aside his

possession and conspiracy convictions. The arguments are without merit.

### A. The Requested In Camera Hearing

The affidavits submitted in support of the applications for warrants to search 49 Marden Street and 165 Peace Street stated, *inter alia,* that the affiant, Detective Nadrowski, had received information from a confidential informant that a Hispanic male (who turned out to be Baez) was distributing cocaine out of the first floor right apartment at 165 Peace Street. The affidavits also stated that this same confidential informant, under police supervision, had made two recent controlled purchases of cocaine in Baez's gray Chevrolet at a prearranged location. In moving for a *Franks* hearing, Baez challenged the veracity of these statements, submitting as proof an affidavit of his own which swore that he had never sold drugs to anyone at a prearranged location. The sum and substance of Baez's position was that Nadrowski had fabricated the confidential informant's existence.

Calling Baez's showing "marginal," the district court nonetheless ruled that Baez's affidavit was substantial enough to warrant a *Franks* hearing. *See Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676 (defendant is entitled to *Franks* hearing if s/he can make a "substantial preliminary showing" that (1) a statement in a warrant affidavit was knowingly or intentionally false, or made with reckless disregard for the truth; and (2) the falsehood was necessary to the finding of probable cause); *see also United States v. Hadfield,* 918 F.2d 987, 992 (1st Cir.1990), *cert. denied,* 500 U.S. 936, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991). Baez and Nadrowski testified at the hearing, and both gave accounts entirely consistent with their affidavits. Baez also provided testimony elaborating on the reason for his entering 49 Marden Street prior to his arrest.[1] He stated that he had gone to the building (for the third time that day) in order to retrieve a telephone bill for the renters of Apartment 7, who were out of town and had asked him to retrieve and to safeguard the

bill. He also stated that he did not know when they would return.

Recognizing that he had not carried his burden of proving that the warrant affidavits were infected by falsehoods, Baez asked, at the conclusion of the hearing, that the district court further examine Nadrowski *in camera* regarding the identity of the confidential informant. The district court denied this request, stating that such a hearing was not necessary. The court then denied Baez's motion to suppress the evidence seized during the execution of the search warrants. In so doing, the court found that Nadrowski had been a credible witness and that Baez had been less credible (particularly with regard to the reason for his presence at 49 Marden Street just prior to his arrest).

It is settled that " 'a district court need not · conduct an *in camera* hearing whenever the identity of an informant is requested.' " *United States v. Higgins,* 995 F.2d 1, 3 (1st Cir.1993) (quoting *United States v. Fixen,* 780 F.2d 1434, 1439 (9th Cir.1986)). Instead, it is entirely within the discretion of the judge presented with the request to decide whether the disclosure is necessary in order to determine the believability of the testifying officer. *Id.* And there is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. *Franks,* 438 U.S. at 171, 98 S.Ct. at 2684. Moreover, the factual findings made by a district court in connection with a *Franks* hearing are reviewed only for clear error. *United States v. Barnett,* 989 F.2d 546, 556 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993) *and* —— U.S. ——, 114 S.Ct. 149, 126 L.Ed.2d 110 (1993).·

Here, we can perceive no abuse of discretion in the trial judge's refusal to hold the requested *in camera* hearing. At the conclusion of the *Franks* hearing, the judge credited the testimony of Detective Nadrowski and discredited that of Baez. He also found that he had heard enough at that point to satisfy himself that there was no basis for concluding that Nadrowski's affidavits were

---

1. The affidavit submitted in support of the request for a warrant to search Apartment 7 at 49 Marden Street noted that Baez had entered the building just prior to his arrest.

false. We have carefully reviewed the transcript of the *Franks* hearing and can discern no error, let alone clear error, in any of these rulings. This ends the matter.

Accordingly, we reject Baez's argument that the court's failure to hold an *in camera* hearing after the *Franks* hearing requires reversal of his convictions.

### B. Duplicity in the Indictment

■ Baez's second argument, that Count II (the possession count) of the superseding indictment was duplicitous, requires little discussion. Baez never objected to Count II for duplicity, or any other grounds, in the district court. He accordingly has waived his argument. *See* Fed.R.Crim.P. 12(b)(2) (defenses and objections based on defects in the indictment (other than that it fails to show jurisdiction in the court or to charge an offense) must be raised prior to trial); *see also United States v. Sheehy*, 541 F.2d 123, 130 (1st Cir.1976).

■ Even were we to reach the merits of Baez's duplicity argument, we would reject it as based upon a misapprehension of the concept of duplicity. Baez's problem with Count II does not lie in the wording of the count; it lies in the fact that the evidence underlying the count allegedly could have given rise to three separate counts charging possession. This is not duplicity. A count is duplicitous when it *charges* more than one offense in a single count. *United States v. Huguenin*, 950 F.2d 23, 25 (1st Cir.1991) (*per curiam*). Although other factors are involved, the prohibition against duplicitous indictments arises primarily out of a concern that the jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of any particular offense. *See id.* at 26.[2] Obviously, this only becomes a problem when the indictment actually charges two or more offenses in a single count. Here, Count II of the indictment charged only one offense: "That on or about July 21, 1993, in the District of Rhode Island, the defendants, DOMINGO BAEZ and MARIA VALERIO, did knowingly, willfully and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance." The question whether the actions to which this count referred *could* have been charged as separate crimes is irrelevant. The count was not duplicitous.

Accordingly, we reject Baez's argument that there was a duplicitous count in his indictment.

### III.

### Valerio's Appeal

Valerio's sole appellate argument is that the evidence adduced at trial was not sufficient for the jury to have concluded beyond a reasonable doubt that she possessed the cocaine with an intent to distribute it, aided or abetted such a possession, or conspired to commit such a possession. After carefully reviewing the record, we agree. Central to our determination is a belief that the jury could not reasonably have found that Valerio had an intent to distribute cocaine.

■ We start by acknowledging the formidable showing a defendant must make in order to prevail on a claim of insufficient evidence. In conducting a sufficiency assessment, "we examine the record in a light most favorable to the government, drawing all reasonable inferences in its favor, with an eye towards whether the proof would have allowed a rational jury to determine beyond a reasonable doubt that the defendant was guilty of the crime charged." *Ortiz*, 23 F.3d at 24. "In this analysis, no premium is placed upon direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." *United States v. Ortiz*, 966 F.2d 707, 710 (1st Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993). In fact, the government's proof may lay *entirely* in circumstantial evidence. *United States v. Akinola*, 985 F.2d 1105, 1109 (1st Cir.1993).

**2.** For example, if Count X of an indictment charges a defendant with having committed two offenses, A and B, a conviction would be possible even if Jurors 1–6 found only that the defendant committed offense A, and jurors 7–12 found only that the defendant committed offense B.

 That having been said, it must be borne in mind that the proof must still have been sufficient for the jury to have found guilt *beyond a reasonable doubt.* *See United States v. Loder,* 23 F.3d 586, 590 (1st Cir. 1994). Thus, although the government need not exclude every reasonable hypothesis of innocence in order to sustain the conviction, *see Ortiz,* 23 F.3d at 24, we are loath to stack inference upon inference in order to uphold the jury's verdict, *cf. Ingram v. United States,* 360 U.S. 672, 680, 79 S.Ct. 1314, 1320, 3 L.Ed.2d 1503 (1959) (citing *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)).

 In order to secure a conviction under the possession with intent to distribute count, the government had to prove beyond a reasonable doubt that Valerio knowingly and intentionally possessed the drugs, *and that she did so with an intent to distribute them. United States v. Paulino,* 13 F.3d 20, 25 (1st Cir.1994). Under the conspiracy count, the government had to prove beyond a reasonable doubt that Valerio intended to agree and intended to effectuate the commission of the underlying possession with intent to distribute offense. *See United States v. Piper,* 35 F.3d 611 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995). For Valerio to have been convicted under an aiding and abetting theory, the government had to prove that (1) Baez committed the underlying substantive crime; and (2) Valerio "associated [her]self with the venture, participated in it as something [s]he wished to bring about, and sought by [her] actions to make it succeed." *Loder,* 23 F.3d at 590–91 (citations omitted). It is clear, therefore, that both of Valerio's convictions must be set aside if the jury could not have found beyond a reasonable doubt that Valerio intended that the cocaine be distributed. No such finding was possible on this record.

First, there was no direct evidence that Valerio participated in or helped facilitate the distribution of any cocaine. Nor is there any direct evidence that she intended that the cocaine be distributed. Thus, the government is left to argue that proof of Valerio's distributive intent can be found in a type of circumstantial evidence of which we have approved on several occasions: knowledge of the quantity of the drugs involved. *See Ortiz,* 23 F.3d at 25 (intent to distribute can be inferred from the quantity of the controlled substance possessed) (citing *United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993)). In other words, the government's position is that, because the quantity of drugs found in 165 Peace Street was not consistent with personal consumption, the jury correctly inferred a distributive intent on the part of Valerio.

The problem with this position is that, even were we to infer that Valerio was aware of the 14.83 grams of cocaine in the baby shoe,[3] the evidence at trial was insufficient to prove that Valerio knew of the existence of the cocaine in the chair lining. This cocaine was not in plain view, and not likely to have been discovered by a short-term occupant of the bedroom.[4] And without a finding that Valerio knew about this cocaine, the quantity of drugs of which Valerio was aware is not large enough to support an inference of distributive intent.

Of course, if it had been demonstrated that Valerio was a long-term occupant of the

---

3. The reasonableness of such an inference, which the government urges us to draw because Valerio was taking care of a baby at the time of the search, is open to serious question. First, it appears that the cocaine in the baby shoe was not in plain·view; that is to say, there is no suggestion that it was sticking out of the shoe and visible to occupants of the bedroom in which it was found. And second, the government did not attempt to prove at trial that the shoe be-longed to Valerio's baby. When these facts are considered in conjunction with the fact that the evidence was insufficient to prove that Valerio

was anything other than a short-term visitor to the apartment, *see infra* at 65, we are skeptical that any factfinder could conclude beyond a reasonable doubt that Valerio knew of the cocaine in the baby shoe.

4. The government asserts that "[a]lthough not exposed to plain view, the cocaine was readily accessible since one only had to turn over the chair to find it." The issue, however, is not accessibility; it is knowledge of the cocaine's existence.

apartment at 165 Peace Street, it might be reasonable to infer that she knew about all the drugs that were stored there. The evidence at trial was insufficient, however, to prove beyond a reasonable doubt that Valerio had been anything other than a short-term occupant of the apartment at 165 Peace Street at the time of her arrest. Although the rent receipts for the apartment were issued in Valerio's name, the landlord of the apartment testified that this was done at Baez's request; and it was for this reason that the court instructed the jury not to consider the rent receipts in connection with the case against Valerio. Furthermore, the landlord testified that he lived at 165 Peace Street but had never seen Valerio prior to her arrest. And, of course, Baez himself testified that Valerio had only been visiting for two or three days prior to her arrest. The jury was free to disbelieve any and all of this testimony; any inference of longer-term residence must, however, have been predicated on an evidentiary basis. There was no such basis here.[5]

Before concluding, we think it important to point out that the evidence against Valerio in this case was even weaker than that in other cases in which we have reversed convictions on sufficiency grounds.

In *United States v. Ocampo*, 964 F.2d 80 (1st Cir.1992), for instance, we held that the evidence was insufficient to support the defendant's conviction for conspiracy to possess with intent to distribute cocaine. In that case, the evidence showed, *inter alia*, that the defendant had lived in the apartment where the cocaine had been stored for four to six months, and that she had told investigating officers that five quart-sized cans of acetone found in the apartment (evidence at trial established that acetone is used to dilute

cocaine) were used "to clean off her fingernails." *Id.* at 81–82.

In *United States v. Hyson*, 721 F.2d 856 (1st Cir.1983), we found the evidence insufficient to support one defendant's conviction for conspiracy to distribute and to possess with intent to distribute heroin, marijuana, hashish and cocaine. In that case, the evidence established that this defendant lived with a codefendant in an apartment where hashish was stored and knew of its existence. *Id.* at 862–63.

And in *United States v. Mehtala*, 578 F.2d 6 (1st Cir.1978), we found the evidence insufficient to support the defendant's conviction for knowingly and intentionally importing marijuana into the United States. In that case, the evidence established that the defendant, a twenty-year-old girl, had spent nearly four months at sea in a "close relationship" with the captain of a ship off whose stern was floating approximately fifty pounds of marijuana. *Id.* at 7–10.

The evidence here may well have been sufficient to support a finding that Valerio possessed cocaine. It was not, however, sufficient to support a finding that she intended that cocaine be distributed. Because such a finding was a necessary element of her offenses of conviction, her convictions cannot stand.

Accordingly, we reverse Maria Valerio's convictions for possession of cocaine with intent to distribute and conspiracy to commit the same offense.

### IV.

For the reasons stated, we *affirm* the convictions of defendant Domingo Baez and *re-*

---

**5.** The government makes much of the fact that the bedroom contained a flowered purse, identification cards for Valerio, a child's health care record to which Valerio's name was affixed, and photo albums containing pictures of Baez and Valerio, arguing that "[t]hese are not the type of items one would expect to find if Valerio were merely a casual visitor to the apartment." We cannot agree; in our view, there is nothing at all unusual about a mother of a baby bringing a

purse, identification, and the baby's health records along on a multiple-day visit to a friend living approximately two hundred miles away. And even if we assume that the photo albums were Valerio's (which we have no basis for doing), there is nothing in the record indicating that the albums were of such a nature, or set up in such a way, that they were unlikely to have been brought to Providence by Valerio on a short visit.

*verse* the convictions of defendant Maria Valerio.[6]

---

**6.** Because Baez was convicted of conspiring both with Valerio *and* with "other persons known and unknown to the Grand Jury," our reversal of Valerio's conspiracy conviction does not require reversal of Baez's conspiracy conviction.