# United States Court of Appeals
## For the First Circuit

No. 19-1349

UNITED STATES OF AMERICA,

Appellant,

v.

LUIS F. GUZMAN-ORTIZ,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Mark T. Quinlivan, Assistant United States Attorney, and
Andrew E. Lelling, United States Attorney, on brief for appellant.
E. Peter Parker on brief for appellee.

September 16, 2020

BARRON, **Circuit Judge**. In June of 2018, a jury in the United States District Court for the District of Massachusetts found Luis Guzman-Ortiz guilty of one count of conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846. The following spring, however, the District Court granted Guzman-Ortiz's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The District Court ruled that there was insufficient evidence in the record to permit a reasonable juror to find beyond a reasonable doubt that Guzman-Ortiz knowingly either agreed to participate or participated in the alleged conspiracy. The United States now appeals from that ruling. We **affirm**.

## I.

We recount the essential facts of the case, drawn from the trial record, in the light most favorable to the verdict. See, e.g., United States v. Mubayyid, 658 F.3d 35, 41 (1st Cir. 2011). On July 6, 2015, a United States Drug Enforcement Administration (DEA) Task Force, which included DEA agents and officers from local police departments in Massachusetts, was investigating Oristel Soto-Peguero and Mercedes Cabral, a couple who were then living in a two-bedroom, two-story apartment in Norwood, Massachusetts, for their possible involvement in distributing drugs. At 1:43 p.m. that day, the Task Force used a wiretap to listen to a telephone conversation between Soto-Peguero and an individual by the name of

Eddyberto Mejia-Ramos, who was a suspected drug dealer and another target of the Task Force's investigation. Soto-Peguero received the call at the apartment he leased with Cabral in Norwood and used coded language to tell Mejia-Ramos that he had heroin for sale.

Suspecting an imminent heroin delivery based on the call, the Task Force set up surveillance of the Norwood residence that afternoon. At 6:00 p.m., Task Force members observed Cabral leave the apartment and go to the grocery store. When she returned about an hour later, Task Force members saw Guzman-Ortiz exit the apartment and assist Cabral with bringing grocery bags into it. This was the first time that the Task Force had come across Guzman-Ortiz during the investigation into Soto-Peguero and Cabral.

At 8:57 p.m., Soto-Peguero received a phone call at the apartment from Mejia-Ramos, requesting, again in coded language, that Soto-Peguero sell and deliver a large amount of heroin. Soto-Peguero agreed and said that he would dispatch Cabral with heroin to Mejia-Ramos' location. Approximately half an hour later, Cabral got back in her car and left the apartment.

Members of the Task Force followed Cabral in her car. Then, at 9:38 p.m., Soto-Peguero called Mejia-Ramos and told him that Cabral was on her way. Thereafter, the Task Force members following Cabral pulled her car over. While she was detained,

Task Force members seized seven to ten bricks of heroin (totaling 918 grams) wrapped in cellophane packaging from her purse. Soto-Peguero's fingerprints were later identified on the bricks of heroin recovered from Cabral's purse. Guzman-Ortiz's fingerprints were not found on any of those packages.

Around 10:00 p.m., after Cabral was arrested, members of the Task Force decided to "enter and freeze" the apartment in Norwood that Cabral and Soto-Peguero had leased pending the issuance of a search warrant. After knocking and announcing their presence, Task Force members forcibly entered through the apartment's front and back doors.

As the Task Force members were attempting to enter the apartment, Soto-Peguero and Guzman-Ortiz ran up the stairs, where they were observed standing near a window in one of the bedrooms. Task Force members ordered the two men to come downstairs. After as many as ten minutes, and following numerous commands to descend, they did.

Soto-Peguero descended by sliding face-first down the stairs. One Task Force member testified that as Soto-Peguero slid down, he observed two plastic, knotted baggies on the floor, which he assumed had spilled out of Soto-Peguero's clothes. Guzman-Ortiz descended next and without incident.

A sweep of the apartment by Task Force members turned up, in the same upstairs guest bedroom that Soto-Peguero and

- 4 -

Guzman-Ortiz had fled to as Task Force members entered the apartment, a kilogram of heroin fully wrapped in opaque, black electrical tape and partially hidden in an air duct located on the floor below the window where the two men had been observed standing. It is unclear from the record whether, when it was discovered, the brick of heroin would have been readily apparent to someone entering the bedroom without lifting the cover of the air duct. The sweep also revealed what appeared to be a quarter baggie of a powder drug, less than ten millimeters in diameter, to the right of the vent.

In a second bedroom that appeared to belong to Soto-Peguero and Cabral, Task Force members found during the sweep another 834 grams of heroin, some of which was wrapped in a black plastic bag on the floor and the rest of which was discovered inside of a dresser. In that same bedroom, Task Force members found six cellphones and some drug-packaging materials.

Downstairs, the state of the kitchen indicated that Guzman-Ortiz, Soto-Peguero, and Cabral had eaten a meal together that evening. In the living room, Task Force members found the base of a blender or grinder on the floor, and, on the dining room table, they found a roll of cellophane wrapping tape and some cellphones. In a closed but unlocked hallway closet, there was a small bag of heroin, cutting agents, Glad sandwich bags, aluminum mixing bowls with drug residue, a digital scale, parts of a drug

press, and a mold for use in a hydraulic drug press. In the first-floor bathroom, there was a drug press inside a large opaque bag, which, although it is unclear from the record, may have been open at the time that Guzman-Ortiz was in the apartment.

A grand jury in the District of Massachusetts indicted Guzman-Ortiz on March 23, 2016, charging him with possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846.[1] Guzman-Ortiz's trial started on June 18, 2018. He moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 after the close of evidence, but the District Court allowed the jury to render a verdict. The jury found Guzman-Ortiz guilty on the conspiracy charge but failed to return a verdict on the substantive possession charge.

Post-verdict, Guzman-Ortiz renewed his motion for a judgment of acquittal on the conspiracy charge. The District Court granted the motion on March 14, 2019, reasoning that "[t]here was no evidence that the drug distribution paraphernalia had been used on the day in question, or that the heroin seized from Cabral had been prepared and packaged that day, or that [Guzman-Ortiz] was

---

[1] Soto-Peguero was separately tried and convicted of numerous drug-related offenses, but, notably, the jury found him not guilty of conspiracy to distribute with Guzman-Ortiz -- the same conspiracy count for which Guzman-Ortiz was later convicted.

- 6 -

aware of or had participated in such activities." The District Court further explained that **"the only evidence of [Guzman-Ortiz's] participation in [the conspiracy], or his agreement to so participate, was his response, jointly with Soto-Peguero, to the attempted and ultimately successful entry into the apartment by the agents."** The District Court deemed that evidence insufficient to meet the government's burden of proof.

The government appealed the District Court's decision on April 9, 2019. We have jurisdiction under 18 U.S.C. § 3731.

## II.

To establish a violation of 21 U.S.C. § 846, the government must prove the following elements beyond a reasonable doubt:

> (1) the existence of a conspiracy, (2) the defendant's knowledge of the conspiracy, and (3) the defendant's knowing and voluntary participation in the conspiracy. "Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy."

United States v. Paz-Alvarez, 799 F.3d 12, 21 (1st Cir. 2015) (internal citation omitted) (quoting United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011)). "[T]o establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" United States v.

- 7 -

Gomez-Pabon, 911 F.2d 847, 853 (1st Cir. 1990) (quoting United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989)).

We review a District Court's decision to grant a motion for judgment of acquittal de novo. See Mubayyid, 658 F.3d at 47. "[W]e may uphold the judgment of acquittal only if the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendants' guilt beyond a reasonable doubt." Id.

## A.

Guzman-Ortiz does not dispute the District Court's determination that "the evidence supports a finding that he, at some point, knew illegal drug activity was conducted" in Soto-Peguero and Cabral's apartment. The District Court concluded, however, that there was insufficient evidence to show beyond a reasonable doubt that Guzman-Ortiz agreed to participate in or participated in the drug conspiracy. Our analysis thus focuses on that point.

"'Mere association' with conspirators or 'mere presence' during conduct that is part of the conspiracy is insufficient to establish knowing participation; the defendant must be found to have shared his co-conspirators' intent to commit the substantive offense." United States v. Ortiz, 447 F.3d 28, 32–33 (1st Cir. 2006) (internal citations omitted). However, due "to the clandestine nature of criminal conspiracies, the law recognizes

- 8 -

that the illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstance.'" United States v. Flores-Rivera, 56 F.3d 319, 324 (1st Cir. 1995) (quoting United States v. Sánchez, 917 F.2d 607, 610 (1st Cir. 1990)). For this reason, in a case like this one, in which the defendant claims that he was merely in the presence of others involved in a conspiracy, "[t]he attendant circumstances tell the tale -- and the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement. In other words, a defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking." United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993).

The government does not dispute that here there is no direct evidence that Guzman-Ortiz agreed to participate in the conspiracy. Nor is there direct evidence that he in fact participated in it. For example, there was no direct evidence tying Guzman-Ortiz to any of the drugs turned up during the investigation, nor was his voice picked up on any of the phone calls the Task Force members listened in on during the investigation. In fact, as we have noted, authorities did not come across Guzman-Ortiz in the investigation of the heroin conspiracy until they saw him come out of the apartment to assist

Cabral with her groceries on the night that she was eventually arrested.

On the other hand, the record supportably showed that Guzman-Ortiz was present in Soto-Peguero and Cabral's apartment that night for at least four hours, and there was ample evidence to support the District Court's finding that the hosts used that residence to carry out a heroin distribution conspiracy. In fact, a jury could have found on this record that Soto-Peguero arranged, by phone, a heroin deal during Guzman-Ortiz's visit and that Cabral left the apartment while Guzman-Ortiz was still there to effectuate it. In addition, the record supportably shows that Guzman-Ortiz ran upstairs with Soto-Peguero when Task Force members announced their presence at the apartment and that a brick of heroin was later found partially hidden in an air duct in that area of the residence alongside a small baggie of heroin. Was this "collocation of circumstance," Flores-Rivera, 56 F.3d at 324, enough to mean that the "mere" was lacking, such that a reasonable juror could find beyond a reasonable doubt that Guzman-Ortiz not only knew that his hosts were engaged in distributing heroin but that he was their co-conspirator in that endeavor?

**B.**

In arguing that this quantum of evidence does suffice, the government relies chiefly on United States v. Batista-Polanco, 927 F.2d 14 (1st Cir. 1991). We held there that the circumstances

were such that a juror reasonably could infer that the defendant found in an apartment from which a drug conspiracy was being carried out was not merely an innocent visitor but a co-conspirator in his own right.  Id. at 18-19.

In Batista-Polanco, the defendant, who was charged with "possessing and conspiring to possess one hundred or more grams of heroin for distribution," testified that, although he knew "that heroin was being packaged in the kitchen," "his presence in the apartment was entirely innocent and that he had been waiting there," no more than forty-five minutes, "merely to borrow his cousin's car."  Id. at 16-17.  But, we pointed out that by the defendant's own admission, he was present "for at least forty-five minutes in an apartment conspicuously strewn with evidence of a large-scale heroin packaging operation" and that a "factfinder [could] fairly infer" in such circumstances "that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses to their crimes." Id. at 18 (emphasis added).  We thus rejected "the hypothesis," which we indicated was central to the defendant's case, "that participants in a distribution scheme would permit a noncontributing interloper to remain for an extended period of time in a small apartment while their conspicuous criminal conduct continued unabated."  Id. (emphasis added).

In reaching this conclusion, though, we noted that the police executing a search warrant in the apartment had discovered:

> a large kitchen table laden with over fifteen hundred packets filled with heroin, an assortment of heroin milling and packaging paraphernalia, and some bulk heroin. Five chairs and a makeshift seat were arranged around the kitchen table; jackets and sweaters were draped on some of the chairs. More than seventeen hundred packets of heroin were found in a bag on the kitchen floor; another three thousand packets were discovered elsewhere in the apartment. Six men were found inside the apartment, including [the defendant] who was in the living room with his cousin.

Id. at 16. We also explained that:

> [t]he inference that [the defendant] was a participant in the heroin packaging operation was strongly supported as well by reasonable implication from the fact that the kitchen table at which the heroin was packaged was surrounded by six seats -- one a makeshift seat consisting of an overturned bucket with a cushion. It is difficult to resist the reflexive inference that the sixth seat was devised to enable all six men, including [the defendant], to sit at the kitchen table and to participate in the heroin packaging.

Id. at 18.[2]

Here, if we look, as we did in Batista-Polanco, to the evidence of the physical state of the apartment while Guzman-Ortiz

_____

[2] We also found that the "the district court's well-supported finding that [the defendant] gave materially false testimony concerning the duration of his stay in the apartment provided a basis for discrediting other exculpatory testimony given by Batista-Polanco in his own defense." Batista-Polanco, 927 F.2d at 18.

was known to have been present within it,[3] we find a quite different scene. Most of the heroin found in the residence during the Task Force's sweep of it that evening was found in a bedroom that was very clearly occupied by the lessees, Soto-Peguero and Cabral. No evidence indicated that this bedroom was a common area, such that it could be reasonably inferred that Guzman-Ortiz would have entered it simply because he was invited into the apartment. Moreover, all the heroin in that room was either wrapped in a black plastic bag or inside a dresser and thus obscured from view.

Additional heroin was found during the sweep in the guest bedroom. But, once again, nothing in the record indicates that Guzman-Ortiz -- who the record does not suggest was an overnight visitor -- would have been granted access to this bedroom in the normal course of his stay. Most of the heroin found there was wrapped in black tape and partially hidden in the room's air duct.

---

[3] It is unclear from the record when Guzman-Ortiz arrived at Soto-Peguero's residence and how long he was present there. The DEA Task Force did not set up surveillance of the home until some time after Soto-Peguero's 1:43 p.m. phone call with Mejia-Ramos, and there is no testimony that they surveilled the back door of the apartment. Task Force members observed Guzman-Ortiz for the first time when he exited the apartment around 7:00 p.m. to help Cabral bring in bags of groceries from her car. The Task Force members did not see Guzman-Ortiz leave through the front door of the apartment at any time after that, and he was found with Soto-Peguero around 10:00 p.m. when the members of the Task Force entered the residence. In its brief, the government contends that Soto-Peguero was in the apartment for at least four hours, and the evidence in the record, viewed favorably to the verdict, would support that timeframe.

There was also a small baggie of powder found near the air duct, but, given its size, it is not readily apparent it would have been visible as contraband to anyone who entered.[4]

The only other heroin in the apartment also was not in plain view of anyone who entered and thus "[k]knowledge of [it] cannot be imputed to" Guzman-Ortiz. United States v. Morillo, 158 F.3d 18, 24 (1st Cir. 1998). For example, the search turned up heroin in the closet on the first floor of the apartment. But, as the District Court noted, it "was located behind closed doors" and thus was not conspicuous.

Finally, the government points out that Task Force members found the base of a blender or grinder, cellophane tape, and some cellphones out in the open in various places in the first floor of the apartment, as well as a drug press in the bathroom. We agree that a jury could infer that Guzman-Ortiz would have seen these items during his visit. But, unlike in Batista-Polanco, where the defendant did not dispute "being at the apartment while the large scale heroin packaging operation was in process," 927 F.2d at 18 (emphasis added), these items do not themselves support the inference that this was the case here. Thus, the record bears out the District Court's assessment that there was no evidence

_____

[4] It is also unclear whether the plastic baggie and the heroin wrapped in black tape were present in this room before the DEA Task Force was knocking at the door, which is an issue we will return to later.

that "heroin processing or packaging occurred in view of [Guzman-Ortiz] or with his participation."

Accordingly, while we found the physical state of the apartment in Batista-Polanco inconsistent with the notion that the defendant was "merely" present there, we cannot conclude similarly here. There, we rejected the notion that participants in a drug distribution conspiracy would invite a non-participant to their base of operations so he could observe them packaging drugs for distribution for upwards of an hour, and we concluded that the evidence of the state of the apartment in that case revealed that it would have been reasonable there for a juror to find that the defendant had been at least a witness -- and perhaps a direct participant -- in the packaging of drugs in the kitchen during his visit. See Batista-Polanco, 927 F.2d at 18-19.

The physical condition of the apartment in this case, however, does not permit a similar inference that Guzman-Ortiz's hosts, given what it is fair to surmise they permitted him to observe just by inviting him into the apartment, would have let him enter only if he was a co-conspirator. Thus, here, we cannot conclude that a reasonable juror could find -- with the level of certainty required in a criminal case -- that Guzman-Ortiz, simply by being where he was, was himself a co-conspirator. See United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995) ("[W]hile criminals generally might be presumed not to bring along

- 15 -

nonparticipants to witness their criminal activities, we do not think that necessarily holds true when the criminal activity will not be open and obvious." (quoting United States v. de la Cruz-Paulino, 61 F.3d 986, 1002 (1st Cir. 1995))); cf. United States v. Ocampo, 964 F.2d 80, 82 (1st Cir. 1992) ("[Even if i]t is a fair inference that defendant knew what was going on, . . . that is not enough to establish intent to conspire.").

The other cases that the government relies on are, like Batista-Polanco, also distinguishable. In United States v. Sepulveda, for example, we permitted an inference of participation in a drug conspiracy based on the defendant's "consensual presence" in a home where "large quantities of drugs were being packaged for resale." 15 F.3d 1161, 1174 (1st Cir. 1993) (emphasis added). And, in United States v. Hernandez, we affirmed the drug conspiracy conviction of a defendant who was seen "linger[ing] outside" an apartment where he knew a drug transaction would occur "for over an hour on a winter day in a location which afforded him an obvious vantage point from which to observe the surrounding neighborhood as well as the ingress to the" apartment. 995 F.2d 307, 314 (1st Cir. 1993). But, no similar evidence here gives rise to an inference that Guzman-Ortiz was participating in a conspiracy with Soto-Peguero and Cabral in the way that the evidence supported the inference that the defendant in Hernandez was participating in that conspiracy by serving as a "lookout" for a drug transaction.

- 16 -

See id. ("[T]he evidence, as a whole, adequately supported the conclusion that [the defendant] knowingly remained on the front porch to facilitate the prearranged drug transaction.").

It is true that in affirming the conviction in Hernandez, we noted that the defendant "did not reside at the apartment where the drug transaction occurred, nor was he a captive of the circumstances." Id. And that is true of Guzman-Ortiz in this case. But, we explained that the defendant's conviction in Hernandez rested on much more than just that observation. See id. at 314-15 (noting that the defendant was present during conversations about drug transactions, agreed "with his brother's assessments concerning the quality of the cocaine and the low level of police activity in the neighborhood," made "statements about the 'money' and 'merchandise,'" and fled "in a rapid manner" from law enforcement when they arrived on the scene). Thus, insofar as the government contends that a reasonable juror could find beyond a reasonable doubt based on Guzman-Ortiz's presence in Soto-Peguero's apartment -- just due to its physical state -- that he agreed to participate or participated in the distribution conspiracy, we do not agree. Cf. United States v. Hyson, 721 F.2d 856, 862 (1st Cir. 1983) ("[The defendant's] occupancy of the apartment with knowledge that hashish was being stored there is not sufficient" to prove "that [the defendant] was aware of the purpose of the conspiracy and willingly participated with the

- 17 -

intent to advance its purpose."); United States v. Mehtala, 578 F.2d 6, 10 (1st Cir. 1978) ("Even if through the supposed close relation between Mehtala and the Double Eagle's captain, Mehtala obtained knowledge of the presence of the marijuana, this knowledge would not be sufficient to convict her of aiding and abetting.").

## C.

The government does not rely, however, solely on what the evidence shows about what Guzman-Ortiz would have seen just from looking around the apartment in contending that the evidence sufficed to support the conspiracy conviction. The government also points to the activity that a jury could find occurred in the apartment during Guzman-Ortiz's visit. The government asserts that the evidence of this activity -- at least when considered in combination with the evidence just described, as it must be -- suffices to provide the necessary support for the conviction. But, we are not persuaded.

The government first asserts that the jury could fairly infer from the record both that Guzman-Ortiz was present in the residence during the latter two of the three telephone conversations that Soto-Peguero had with Mejia-Ramos arranging a drug transaction and that he was present "when Cabral left the apartment with between seven and ten bricks of heroin." But, evidence that telephone calls were made -- by its nature -- is not like physical evidence of drug distribution that occurs in plain

- 18 -

view in portions of a residence in which a defendant claiming to have merely been a visitor was located. Evidence that calls not involving Guzman-Ortiz were made while he was merely present in the residence, a two-story unit with multiple rooms and a back door that was not under surveillance reveals nothing about his knowledge of the calls, let alone of their contents. See United States v. de la Cruz-Paulino, 61 F.3d 986, 1001-02 (1st Cir. 1995) (noting that an "innocent observer" to one side of a drug call might not have inferred that criminal activity was being discussed and that "[w]hile criminals generally might be presumed not to bring along nonparticipants to witness their criminal activities, we do not think that necessarily holds true when the criminal activity will not be open and obvious").[5] It would require an exercise in sheer speculation on this record for the jury to infer from the mere fact of those calls having been made that the hosts freely engaged in their illegal trade in Guzman-Ortiz's presence and with his awareness of the calls' significance. As we have

---

[5] The District Court noted that in the first monitored telephone call, at 1:43 p.m., "Soto-Peguero told Mejia-Ramos, 'Call me because . . . because I have a lot of food. . . . I have a lot of food around. I got ready for you.' 'Food' was a code word for heroin." In the second call, at 8:57 p.m., after Mejia-Ramos said "[s]end me something heavy, heavy duty," Soto-Peguero responded, "[y]ou're going to be clean . . . you're going to clean everything so I can send you, at least four hundred." And, in the final call between the two men, at 9:38 p.m., Soto-Peguero told Mejia-Ramos that "she's around there on her way, the woman," to let him know that Cabral was en route with his heroin.

explained, the physical state of the apartment was not such as to make it reasonable to presume that the calls transpired in a manner that would have revealed their nature to Guzman-Ortiz, and the government points to no other evidence that could make the inference more than the product of mere speculation.

Likewise, though Guzman-Ortiz may have been present when Cabral left the apartment to deliver heroin to Mejia-Ramos, Guzman-Ortiz correctly points out that "[t]here was no evidence that [Guzman-Ortiz] ever saw Cabral in possession of heroin inside of the apartment.  There was no evidence that he ever saw her carrying a purse stuffed with heroin."  Thus, the fact that she left -- even if for unexplained reasons -- cannot suffice to show that Guzman-Ortiz must have been in on the conspiracy, as again speculation alone could fill in for what the evidence itself fails to show on this score.

That leaves, then, the government's contention that Guzman-Ortiz's status as a co-conspirator is confirmed once we take account of the evidence that Guzman-Ortiz and Soto-Peguero ran upstairs when Task Force members entered the residence and did not come down for some period of time after being instructed to do so.  The government notes that there was testimony from Task Force members to the effect that Soto-Peguero and Guzman-Ortiz "fled upstairs after the officers at the back door of the apartment saw

[one of the two men] reach for the door handle before turning around when he saw the officers."

The District Court did not agree with the government's characterization of Guzman-Ortiz's action as an attempt to flee the apartment.  It found that "the evidence showed only that neither Soto-Peguero nor defendant opened the door to the apartment when police knocked and that both ran upstairs as agents were pounding on the front door.  This is hardly 'flight from the police.'"

But, even if Guzman-Ortiz's response to the entrance of the Task Force members was a species of flight, we do not see how it suffices to support the conviction, given the nature of the offense at issue, even if we add the evidence of it to the array of evidence canvassed thus far.  Flight from the police certainly can support an inference of guilt as a general matter, as the government stresses.  See United States v. Romero-Carrión, 54 F.3d 15, 17 (1st Cir. 1995) ("[A]ppellant's attempt to flee the scene evinced a keen consciousness of guilt."); United States v. Luciano-Mosquera, 63 F.3d 1142, 1156 (1st Cir. 1995) ("As long as there is an adequate factual predicate supporting an inference of guilt on the crime charged . . . evidence of the accused's flight may be admitted at trial to show consciousness of guilt.").  But, we are not aware of any authority that says it can suffice to show agreement to be part of conspiracy in circumstances such as these.

See United States v. Pintado, 715 F.2d 1501, 1504 (11th Cir. 1983) (noting that "[p]resence followed by flight is . . . inadequate proof" of "participation in a conspiracy" (quoting United States v. DeSimone, 660 F.2d 532, 537 (5th Cir. 1981)); see also Hernandez, 995 F.2d at 315 (noting that "evidence of flight would not have been enough in and of itself to support [the defendant's conspiracy] conviction[]").

Indeed, only one of the cases that the government cites in support of its flight-based argument involved a challenge to the sufficiency of the evidence of a conspiracy conviction. See United States v. Littlejohn, 489 F.3d 1335, 1339 (D.C. Cir. 2007) (discussing evidence of flight vis-à-vis a defendant charged as being a felon in possession of a firearm); United States v. Starks, 309 F.3d 1017, 1025 (7th Cir. 2002) (similar, concerning a defendant charged with possessing cocaine and cocaine base with intent to distribute); Romero-Carrión, 54 F.3d at 17 (similar, concerning a defendant charged with possessing cocaine with intent to distribute). And, in the conspiracy case, United States v. Lopez, 944 F.2d 33 (1st Cir. 1991), the court rested its determination that the evidence sufficed to show that the defendant was a participant in the conspiracy on much more than just the evidence of the defendant's flight from the scene of the crime. In fact, in that case, the defendant was not merely a visitor to the apartment that served as the center of the conspiracy's

- 22 -

operations but was the lessee.  Id. at 36.  Moreover, she had indirectly intimated to the police that she knew about the drugs and had been fingered by an alleged co-conspirator as knowing about the drugs in the apartment.  See id. at 39-40.[6]

We recognize that, as the government points out, the record contained evidence that a brick of heroin wrapped in opaque black tape was found partially hidden in an air duct below the upstairs window in the same room where evidence indicated that Guzman-Ortiz and Soto-Peguero had been standing after they ran to the second floor when the Task Force members attempted to enter the apartment and that a small baggie containing drug-like powder was found there, too.  The government contends that from this evidence "[t]he jury could reasonably have inferred . . . that Guzman-Ortiz witnessed" Soto-Peguero hiding the heroin.

But we do not see how the jury could have done more than guessed.  See Ocampo, 964 F.2d at 83.  There simply is no evidence in the record from which to draw a reasonable inference about when the heroin was hidden in the air duct, as nothing shows that it was not present there in advance.

---

[6] Our decision in Luciano-Mosquera concerned a conspiracy to import cocaine (in addition to a number of other drug and firearms-related crimes), and, though there was evidence of flight, 63 F.3d at 1147, there also "was overwhelming evidence of each [defendant]'s complicity in the scheme to import the cocaine and of their guilt," id. at 1153.

In any event, this evidence cannot do all that the government needs it to, even assuming the jury could supportably conclude that the heroin was hidden in Guzman-Ortiz's presence as the DEA Task Force was breaking down the door. For, accepting that assumption for the moment, we still are not persuaded by the government's further contention that such an inference would allow a juror to find beyond a reasonable doubt that Guzman-Ortiz was a participant in the conspiracy.

That Soto-Peguero was perhaps willing to expose his criminal conduct by hiding contraband in this manner at that moment -- when he had no real choice -- tells us little about whether Guzman-Ortiz knowingly agreed to join Soto-Peguero in a conspiracy to distribute and possess with intent to distribute heroin. The government speculates that Guzman-Ortiz "may have assisted" (emphasis ours) Soto-Peguero in hiding the heroin in the air duct. But, it identifies no evidence that would tip the scales in favor of this possibility, as compared to the equally plausible possibility that Soto-Peguero hid the heroin himself albeit in Guzman-Ortiz's presence, or, alternatively, that the heroin was placed in the air duct before Guzman-Ortiz was ever present in the bedroom. This sort of speculation between possibilities cannot suffice to make up for the gaps in the evidence that we have identified thus far. See Flores-Rivera, 56 F.3d at 323 ("[I]f the evidence, viewed in the light most favorable to the verdict, gives

equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged . . . a reasonable jury must necessarily entertain a reasonable doubt." (emphasis and internal quotation marks omitted) (quoting United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992))).

**D.**

The government is right that we must consider the evidence in its totality when considering the District Court's Rule 29 determination. See United States v. Amparo, 961 F.2d 288, 290 (1st Cir. 1992). Individual pieces of evidence that might not be enough on their own to show Guzman-Ortiz to be a co-conspirator might add up to tell that tale. But, as we have explained, we have undertaken this more holistic inquiry, and the problem for the government is that, even when looked at in that encompassing manner, the evidence was not enough to support a finding that Guzman-Ortiz participated in the conspiracy beyond a reasonable doubt.

Guzman-Ortiz was found in an apartment in which there was evidence to indicate that he had shared a meal with persons he could have known to be involved in illegal activity. But, there is no evidence that he was a frequent presence there or that he stayed much longer than one would expect a social visitor to remain. There is no evidence that Soto-Peguero or Cabral (or anyone else potentially involved) identified Guzman-Ortiz as a co-

conspirator. Indeed, as the District Court noted, the Task Force, despite having an ongoing investigation into Soto-Peguero and Cabral, "had not known of, or seen, [Guzman-Ortiz] before" the day they arrested him.

Nor was there any evidence to support the inference that, during Guzman-Ortiz's visit to the apartment that day, he observed the conspirators engaging in the manufacture, packaging, or distribution of any drugs. The only heroin potentially in "plain view" was found in the upstairs bedrooms and in a closed closet -- and there is no evidence that Guzman-Ortiz accessed those areas before the police arrived. There is also an absence of any other evidence that other easily-recognizable drug distribution activities occurred in Guzman-Ortiz's presence.

That is not to say there was no evidence of the conspiracy being carried out while Guzman-Ortiz was present in the apartment. But the evidence consisted of coded phone conversations not involving him in an unknown location within the apartment, and a departure by one of the known conspirators that, from all appearances, occurred in a manner that itself did not reveal its purpose.

All that being so, we do not see how the fact that Guzman-Ortiz ran upstairs when the Task Force members entered the apartment and did not immediately come down to meet them demonstrates that he was in fact a conspirator in distributing

- 26 -

heroin in his own right. Nor do we see how, against the evidentiary background just described, the fact that Guzman-Ortiz may have witnessed Soto-Peguero conceal a brick of heroin in an air duct as Task Force members were entering the apartment supports an inference that Guzman-Ortiz participated or agreed to participate in the drug distribution conspiracy.

In so concluding, we emphasize that there was no evidence that drugs or distribution-related evidence was found on Guzman-Ortiz's person or in his phone or at his home, let alone any tied to the conspiracy charged. There also was no evidence of anyone involved identifying Guzman-Ortiz as being part of the distribution scheme. In the face of all the other reasons to find the evidence wanting, the absence of any such evidence confirms our conclusion that the evidence, as a whole, was too slight to suffice to support the conviction. See Ocampo, 964 F.2d at 82–83; United States v. DeLutis, 722 F.2d 902, 907 (1st Cir. 1983); United States v. Izzi, 613 F.2d 1205, 1210 (1st Cir. 1980).

The government is right that a judge may not pursue a "divide and conquer" strategy in considering whether the circumstantial evidence here adds up to Guzman-Ortiz having been a mere visitor or a co-conspirator. But, neither may a judge "stack inference upon inference in order to uphold the jury's verdict." Valerio, 48 F.3d at 64; see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007) ("The strength of

an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"); 2 Clifford S. Fishman & Anne T. McKenna, Jones on Evidence § 11:6 (7th ed. 2020) ("The probative value of an item of circumstantial evidence (i.e., its weight in proving the proposition or fact for which it is offered) depends upon two factors: the number of inferences that must be drawn, and the strength of each inference."). We would have to engage in such impermissible inference stacking here to conclude not merely that "it is certainly possible -- maybe even probable -- that [Guzman-Ortiz] was involved in the conspiracy," but that there was "proof beyond a reasonable doubt" that he was. United States v. Rozen, 600 F.2d 494, 497 (5th Cir. 1979) (quoting United States v. Littrell, 574 F.2d 828, 833 (5th Cir. 1978)). Thus, we agree with the District Court that there is not sufficient evidence to permit a rational jury to find, beyond a reasonable doubt, that Guzman-Ortiz intended to join and effectuate the drug distribution conspiracy. See United States v. Andujar, 49 F.3d 16, 22 (1st Cir. 1995) ("When a jury is confronted, as here, with equally persuasive theories of guilt and innocence it cannot rationally find guilt beyond a reasonable doubt.").

## III.

We **affirm**.

**- Dissenting Opinion Follows -**

**LYNCH**, **Circuit Judge, dissenting**.  It is a very serious matter to set aside the judgment of twelve jurors finding no reasonable doubt that the defendant was guilty of a heroin distribution conspiracy.  See United States v. Connolly, 341 F.3d 16, 22 (1st Cir. 2003) (stating that "a reviewing court must play a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests" and the reviewing court "will reverse only if the verdict is irrational" (internal quotation marks and citations omitted)); United States v. Olbres, 61 F.3d 967, 975 (1st Cir. 1995) ("It is trite, but true, that a court ought not disturb, on the ground of insufficient evidence, a jury verdict that is supported by a plausible rendition of the record." (internal quotation marks and citation omitted)); United States v. Rothrock, 806 F.2d 318, 320 (1st Cir. 1986) (explaining that the district court's "power to set aside a jury verdict [is] very circumscribed" and that "[s]o long as the evidence was such that a rational mind might fairly find guilt beyond a reasonable doubt, the court could not disturb the jury's verdict"); see also United States v. Merlino, 592 F.3d 22, 33 n.5 (1st Cir. 2010) (noting that, in the context of a motion for a new trial, the district court "should interfere with the jury verdict only if the jury has reached a seriously erroneous result").  The facts of this case are such that the law does not

permit judges to undo that judgment.  See United States v. Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991).

Juries are most often wiser than judges.  See Duncan v. Louisiana, 391 U.S. 145, 157 (1968) (noting that an "exhaustive study of the jury in criminal cases concluded that juries do understand the evidence and come to sound conclusions in most of the cases presented to them and that when juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created"); Sioux City & Pac. R.R. Co. v. Stout, 84 U.S. 657, 664 (1873) ("It is assumed that twelve [people] know more of the common affairs of life than does one [person], that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge."); United States v. Moran, 984 F.2d 1299, 1302 (1st Cir. 1993) ("No court lightly overturns a jury verdict on the ground that the jury lacked sufficient evidence, for the jury's central role and competence is to weigh the evidence and find the facts.").  And the jury is wiser here.

The majority opinion is wrong for a number of reasons; I point only to a few.

First, our opinion in Batista-Polanco requires that we honor the jury verdict.  927 F.2d at 18 (holding that the evidence, "[a]lthough wholly circumstantial," was sufficient to support conviction for the counts of possession and conspiracy).  Indeed,

the evidence here is even stronger.  Guzman-Ortiz was in the home of two drug dealers for at least four hours.  He entered their home unobserved, dined with the two dealers in the presence of drugs and drug packaging materials, was there while they took and executed a large drug order, and was there for much longer than the forty-five minutes in Batista-Polanco.  See id.  When the police knocked, Guzman-Ortiz fled upstairs and was found in a room with drugs stashed away to hide them from the entering police. Cf. United States v. Luciano-Mosquera, 63 F.3d 1142, 1147, 1156 (1st Cir. 1995) (holding that there was "an adequate factual predicate supporting an inference of guilt on the crime charged" such that evidence of flight could be admitted where the defendant and his co-conspirators fled from police officers who interrupted a drug shipment); cf. also United States v. Pena, 586 F.3d 105, 111-12 (1st Cir. 2009) (denying the defendant's challenge to the sufficiency of the evidence where the defendant had suddenly fled from the police and the officers subsequently "found [a] cell phone, firearm, and plastic bag containing drugs along the flight path").  It beggars the imagination that Guzman-Ortiz did not help his drug-dealing companions even once in that four hours, including during their attempt to evade the police.  See Batista-Polanco, 927 F.2d at 18 ("[T]he factfinder may fairly infer . . . that it runs counter to human experience to suppose that criminal conspirators would welcome innocent nonparticipants as witnesses

to their crimes."); Luciano-Mosquera, 63 F.3d at 1147, 1156. The jury could easily find he was no innocent guest.

Second, all inferences must be drawn in favor of the verdict. United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018); Olbres, 61 F.3d at 970, 972-74. The majority does the opposite, asserting that only the inferences it draws are rational, while those drawn by the jury were not. Not so. See Olbres, 61 F.3d at 974-75 ("On a motion for judgment of acquittal . . . it is for the jury, not the court, to choose between conflicting inferences."); see also Acevedo-Hernández, 898 F.3d at 161.

Third, the jury was very careful. It did not convict Guzman-Ortiz of the possession charge, showing it carefully followed the instructions as to reasonable doubt. Cf. United States v. DeCologero, 530 F.3d 36, 56 (1st Cir. 2008) (stating that "[w]ith regard to the jury's ability to segregate the evidence and understand the judge's instructions, the verdict itself is often quite telling" and a "discriminating verdict shows that the jury was able to compartmentalize evidence and apply it to each defendant" (quoting United States v. Houle, 237 F.3d 71, 76 (1st Cir. 2001))); United States v. Lara, 181 F.3d 183, 202 (1st Cir. 1999) (explaining that "differentiated verdicts often constitute tangible evidence of the jury's enduring ability to distinguish between the" evidence); United States v. Rehal, 940 F.2d 1, 4 (1st

Cir. 1991) (stating that "the jury's discriminating verdict suggests that it properly compartmentalized the evidence as to the various counts and separately considered defendant's guilt as to each and every one"); United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990) ("The discriminating verdict itself . . . evidenced that the jurors were able to, and did, follow the court's instructions.").  The jurors heard and saw the evidence and delivered their verdict within five and a half hours.  The district judge, nine months later and viewing a cold record, found the evidence is insufficient and that was the only error in this case. See Olbres, 61 F.3d at 970, 975-76.