# United States Court of Appeals
## For the First Circuit

No. 22-1947

UNITED STATES OF AMERICA,

Appellee,

v.

RONALD YOEL MARTE CARMONA, a/k/a Alberto Gonzalez Carmona, a/k/a
Guy

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Kayatta, Selya, and Montecalvo,
Circuit Judges.

Thomas J. Gleason and Gleason Law Offices, P.C. on brief for
appellant.
Joshua S. Levy, Acting United States Attorney, and Karen
Eisenstadt, Assistant United States Attorney, on brief for
appellee.

June 3, 2024

**SELYA**, **Circuit Judge**. Defendant-appellant Ronald Yoel Marte Carmona was convicted on charges stemming from multiple fentanyl sales. On appeal, he challenges the district court's denial of his motions to suppress the fruits of a Terry stop. He adds that the evidence supporting his six convictions was insufficient. Concluding, as we do, that the Terry stop was grounded in reasonable, articulable suspicion and that the verdicts are supported by the record evidence, we affirm.

## I

"We rehearse the relevant facts, recounting them 'in the light most hospitable to the verdict, consistent with record support.'" United States v. Concepcion-Guliam, 62 F.4th 26, 29 (1st Cir.) (quoting United States v. Tkhilaishvili, 926 F.3d 1, 8 (1st Cir. 2019)), cert. denied, 144 S. Ct. 171 (2023). We then lay out the travel of the case.

## A

In early 2019, Travis Roy bought about 150 to 200 grams of fentanyl every two to three days from a seller, whom he knew as "Guy." Roy communicated with Guy by text message. Roy texted Guy the type and quantity of drugs he wanted, and Guy texted him the location in Lawrence or Methuen, Massachusetts at which he could pick up the drugs and make payment. When Roy reported to that location on the specified date, a runner would give him the drugs

and take his payment. Roy never met with Guy. Nor did he know Guy's actual name.

In May of that year, Roy became a confidential informant, and law enforcement began an investigation to uncover Guy's identity. New Hampshire State Trooper Sergeant Shane Larkin — assigned to a Federal Bureau of Investigation (FBI) task force — orchestrated several controlled buys between Roy and Guy. Before each of the controlled buys, law enforcement agents met with Roy to equip him with audio recording devices and provide him with the money he needed to pay for the drugs. During each buy, the agents conducted surveillance of the location where Roy would meet Guy's runner. And after each buy, the agents met with Roy to retrieve both the recording devices and the drugs obtained. Throughout the investigation, Roy contacted Guy by text message to three different phones.

The first controlled buy took place on May 21, 2019. The day before, Roy texted Guy on Phone #1 to order twenty "sticks" (about 200 grams) of fentanyl. On the day of the buy, Guy texted Roy the address where he could meet Guy's runner to pick up the fentanyl. The exchange between Roy and the runner took seconds. Subsequent testing confirmed that the drugs consisted of 197.6 grams of fentanyl.

In early June, Guy texted Roy to inform Roy that he had changed his phone number. The second controlled buy took place on

July 10, 2019.  The day before, Roy and Guy coordinated by text messages to Phone #2 the purchase of another twenty sticks of fentanyl.  The exchange took place the next day:  Roy and a runner — who was later identified as Santo Andres Lara — met at a specified location, the runner gave Roy the drugs, and Roy gave the runner the payment.[1]  Subsequent testing confirmed that the drugs consisted of 196.5 grams of fentanyl.

In July of 2019, law enforcement obtained a ping warrant for Phone #2, which allowed them to obtain information from that phone's service provider about that phone's location at regular intervals.  Location data revealed that Phone #2 was frequently at a residential building (the Riverside residence) in Lawrence.  The data also revealed that Phone #2 was at another residential building (the Alder residence) for a few hours each night.  Based on this information, the agents concluded that Guy resided at the Riverside residence and maintained a stash house at the Alder residence.

The third and fourth controlled buys took place on July 31, 2019 and August 6, 2019, respectively.  The day before each purchase, Roy texted Guy at Phone #2 to buy twenty sticks of fentanyl.  On the day of the exchange, Guy texted Roy from Phone

---

[1] Lara was arrested in October of 2019.  He was subsequently indicted with the defendant and pleaded guilty to two counts related to the July 10 controlled buy.

#2 to tell him where he should meet the runner. Once there, an individual approached Roy's vehicle to give him the fentanyl and retrieve the payment. Subsequent testing confirmed that the drugs exchanged during the third purchase consisted of 194.4 grams of fentanyl; the drugs exchanged during the fourth purchase consisted of 197.3 grams of fentanyl.

On August 15, 2019, Braintree Police Sergeant Matthew Heslam and another agent were surveilling the Riverside residence when Sergeant Heslam received information — pursuant to the ping warrant — that Phone #2 was at the residence. At about 6:00 PM, the agents observed a taxicab arrive and the defendant (carrying a cell phone) exited a rear-side door of the residence and climbed into the taxicab. Suspecting that the defendant was Guy, Sergeant Heslam stopped the taxicab, falsely claiming that the driver had committed a traffic violation, in order to investigate the defendant's identity. As a result of the stop, Sergeant Heslam learned the defendant's name and that he lived at the third-floor apartment in the Riverside residence. The defendant was not arrested.

The fifth controlled buy took place on September 19, 2019. The objective for that buy, though, was to locate Guy's stash house. For that reason, Sergeant Larkin planned a "double deal." Roy requested his usual twenty sticks of fentanyl, and upon receiving them, he requested an additional ten sticks of

- 5 -

fentanyl (presumably to give law enforcement the opportunity to follow the runner to the stash house). Although the runner delivered the additional fentanyl that day, law enforcement was unable to locate the stash house. Subsequent testing confirmed that the drugs exchanged that day consisted of 297.3 grams of fentanyl.

Less than one week later, Guy texted Roy to let Roy know that he had changed his phone number. Law enforcement then obtained a ping warrant for Phone #3. On October 3, 2019, Lawrence Police Officer David Moynihan, Jr., received information that Phone #3 was located at a multifamily home (the Butler residence) in Lawrence, and he set up surveillance. At about 11:30 AM, Officer Moynihan observed the defendant exit the house, hand something to the driver of a vehicle that had pulled up in front of the house, and return to the house. Because the house had two floors and it was unknown which floor the defendant was on, two uniformed agents were tasked with entering the house and investigating which apartment the defendant was occupying.

Lawrence Police Officer Eduardo De La Cruz went up to the second floor. When the defendant answered the door, Officer De La Cruz told him that he was looking for a fictitious individual. The defendant stated that the individual sought did not live there. After Officer De La Cruz asked the defendant if

- 6 -

he was sure, the defendant stated, "I'm the only person that lives here. No one lives here. Only me."

On October 11, 2019, law enforcement agents executed a search warrant of the second-floor apartment in the Butler residence. The defendant was present at the time. In the one furnished bedroom, the agents found $1,555 in cash, Phone #3, and two jewelry receipts. One receipt identified the defendant as the buyer and listed Phone #3 as his telephone number. The defendant was arrested.

**B**

In due course, a federal grand jury sitting in the District of Massachusetts returned a six-count indictment against the defendant and Lara. As relevant here, the indictment charged the defendant with one count of conspiracy to distribute and to possess with intent to distribute 400 grams or more of fentanyl (count one), see 21 U.S.C. § 846, and five counts of distribution and possession with intent to distribute forty grams or more of fentanyl (counts two through six), see 21 U.S.C. § 841. Each of the distribution counts corresponded with a particular controlled buy.

In May of 2020, the defendant moved to suppress the fruits of the August 15 traffic stop, arguing that the stop was unconstitutional because it was not supported by probable cause or reasonable suspicion. In December of 2020, the defendant filed an

amended motion to suppress not only the fruits of the traffic stop but also the fruits of the October 11 search of the Butler apartment. The government opposed both motions, and the court heard argument on August 4, 2021. The court denied the defendant's motions, finding that the agents possessed reasonable suspicion to effectuate the August 15 stop.

The defendant's trial began on July 12, 2022. The government presented testimony from Sergeant Larkin, Sergeant Heslam, Officer Moynihan, Officer De La Cruz, Massachusetts State Trooper Ryan Dolan, Roy, and Lara. It also introduced, among other things, recordings of each of the sales, photographs of the fentanyl, and an extraction report linking all three phones to the same user. At the close of the government's case in chief, the defendant moved for judgment of acquittal. See Fed. R. Crim. P. 29(a). The district court deferred decision. The defendant then presented the testimony of FBI Agent Evan Kalaher in order to highlight to the jury an inconsistency in Lara's testimony. At the close of all the evidence, the defendant again moved for judgment of acquittal, see id., and the court again deferred decision.

On July 18, 2022, the jury returned guilty verdicts on all counts. Following the filing of the defendant's memorandum in support of the motions for judgment of acquittal and the government's opposition, the district court denied the motions.

Although the court acknowledged that the government's case was circumstantial, it observed that "the circumstances weave together in a fashion that lea[ve] me fully satisfied that a reasonable jury under these circumstances could reach the verdict that the jury did in this case." The court subsequently imposed a sentence of 120 months' imprisonment. This timely appeal ensued.

## II

In this venue, the defendant challenges both the denial of his motions to suppress and the denial of his motions for judgment of acquittal. We address each challenge in turn.

## A

We turn first to the district court's denial of the defendant's motions to suppress the fruits of the August 15 traffic stop. In examining the denial of a motion to suppress, "we scrutinize the district court's factual findings for clear error and evaluate its conclusions of law . . . de novo." United States v. Ruidíaz, 529 F.3d 25, 28 (1st Cir. 2008).

In this case, the defendant argues that the district court erred in denying his motions to suppress because the "government failed to establish that law enforcement possessed reasonable suspicion for the warrantless stop of [the] taxi." We review this claim of error de novo. See United States v. Pontoo, 666 F.3d 20, 26 (1st Cir. 2011) (stating that "district court's conclusions of law, including its ultimate conclusion as to whether

the facts as found show reasonable suspicion, engender de novo review"); see also United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).

We begin with constitutional bedrock. The Fourth Amendment's proscription against "unreasonable searches and seizures," U.S. Const. amend. IV, "does not prohibit all searches and seizures but, rather, only those that are unreasonable," Pontoo, 666 F.3d at 27; see Terry v. Ohio, 392 U.S. 1, 9 (1968). The Supreme Court has held that the Fourth Amendment "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002). All evidence seized in contravention of the Fourth Amendment is subject to exclusion. See United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011); see also Terry, 392 U.S. at 12 (explaining that exclusionary rule "has been recognized as a principal mode of discouraging lawless police conduct").

To determine whether a brief investigatory stop — a Terry stop — passes constitutional muster, we must first ascertain whether the officer possessed "reasonable, articulable suspicion of an individual's involvement in some criminal activity." Ruidíaz, 529 F.3d at 28. We then ascertain whether the "actions undertaken pursuant to that stop [were] reasonably related in scope to the stop itself 'unless the [officer had] a basis for expanding [his] investigation.'" Id. at 28-29 (quoting United States v.

- 10 -

Henderson, 463 F.3d 27, 45 (1st Cir. 2006)). The defendant here does not challenge the scope of the stop. We thus limit our review to ascertaining whether the Terry stop was supported by "reasonable, articulable suspicion." Id. at 28.

Reasonable suspicion is a "protean" concept, Arnott, 758 F.3d at 44, and it demands that a reviewing court "look at the 'totality of the circumstances' of each case," Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Reasonable suspicion "deals with degrees of likelihood, not with certainties or near certainties." Arnott, 758 F.3d at 44. But it "requires more than a naked hunch." Id.; see United States v. Arthur, 764 F.3d 92, 97 (1st Cir. 2014). In the last analysis, to be deemed reasonable, the officer's suspicion of an individual's involvement in criminal conduct must be "particularized and objective." Cortez, 449 U.S. at 417; see Arvizu, 534 U.S. at 273.

In the instant case, it is undisputed that the agents who stopped the defendant on August 15 knew the following facts prior to the Terry stop:

- Guy — an unidentified fentanyl seller — coordinated (by way of text message) fentanyl sales with Roy on May 21, 2019 from Phone #1 and on July 10, 2019 from Phone #2.

- 11 -

- Location data from a ping warrant of Phone #2 showed that Phone #2 was frequently located at the Riverside residence.

- On July 30, an agent surveilling the Riverside residence observed the defendant there.

- On August 6, Guy coordinated (by way of text message) another fentanyl sale with Roy from Phone #2.

- On August 15 (the day of the stop), the agents surveilling the Riverside residence — pursuant to information that Phone #2 was there — observed the defendant leaving the residence with a phone in his hand and entering a taxi.

Considering the totality of these circumstances and giving due weight to the inferences drawn by the agents, see Ornelas v. United States, 517 U.S. 690, 699 (1996), we hold that the agents who stopped the defendant possessed a reasonable, articulable suspicion that the defendant was Guy — the unidentified fentanyl seller. This suspicion was "particular, that is, specific" to the defendant, United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000), and it was reasonable: "[a] reasonably prudent police officer standing in [these agents'] shoes and knowing what [they] knew would certainly have harbored such suspicion[]." Pontoo, 666 F.3d at 28; see Arthur, 764 F.3d at 98.

The defendant demurs, arguing that there was no evidence that he "was involved in any criminal activity . . . on the date the taxi was stopped." The case law is clear, though, that an officer's reasonable, articulable suspicion of a defendant's involvement in past criminal activity may ground a permissible Terry stop. See United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996) (citing United States v. Hensley, 469 U.S. 221, 226-29 (1985)). So it was here: the agents who stopped the defendant on August 15 possessed reasonable, articulable suspicion that the defendant had engaged in past criminal conduct and, thus, the Terry stop was permissible.

That ends this aspect of the matter. Because the agents who stopped the defendant on August 15 possessed a reasonable, articulable suspicion that he was Guy and that he had engaged in at least three fentanyl sales, the district court did not err in denying the defendant's motions to suppress the fruits of that stop.

**B**

We turn last to the district court's denial of the defendant's motions for judgment of acquittal. We review the denial of a defendant's timely motions for judgment of acquittal de novo. See United States v. De La Cruz, 835 F.3d 1, 9 (1st Cir. 2016). "In the course of that review, we take the evidence, both direct and circumstantial, in the light most hospitable to the

government and draw all reasonable inferences in the government's favor." Id. And we ask whether that evidence "enables a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime[s]." United States v. Kilmartin, 944 F.3d 315, 325 (1st Cir. 2019) (quoting United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001)); De La Cruz, 835 F.3d at 9. In the end, we "need not be convinced that the verdict is correct; [we] need only be satisfied that the verdict is supported by the record." Kilmartin, 944 F.3d at 325.

To sustain a conviction under 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi) in this case, the evidence present at trial must have enabled the jury to conclude, beyond a reasonable doubt, that the defendant knowingly or intentionally distributed or possessed with the intent to distribute forty grams or more of a substance containing fentanyl. In addition, to sustain a conviction under 21 U.S.C. § 846 in this case, the evidence adduced at trial must have enabled the jury to conclude, beyond a reasonable doubt, both that a conspiracy to distribute or to possess with an intent to distribute fentanyl existed and "that the defendant knowingly and willfully joined in that conspiracy." United States v. Ramos-Baez, 86 F.4th 28, 55 (1st Cir. 2023) (quoting United States v. Millán-Machuca, 991 F.3d 7, 19 (1st Cir. 2021)).

The defendant here challenges all six of his convictions, that is, the five convictions under section 841 for

- 14 -

five controlled buys and the one conviction under section 846 for conspiracy. We examine each conviction below, grouping any that are supported by overlapping evidence.

**1.** Count six. With respect to the conviction stemming from the September 19, 2019, controlled buy coordinated through Phone #3, the defendant argues that there was no evidence proving that Phone #3 belonged to him. This is so, the defendant says, because he was arrested in an unknown location in the Butler apartment, it is unknown where exactly (in the only furnished bedroom) Phone #3 was found, and the receipt linking the phone to him proves at most that the defendant "may have possessed Phone #3 at an earlier time." This is more cry than wool.

At trial, the government put forth sufficient evidence from which a reasonable factfinder could conclude that Phone #3 belonged to the defendant. For one thing, Officer De La Cruz testified that — when he went to the second-floor apartment of the Butler residence — the defendant "identified himself as Ronald Carmona" and stated that he was "the only person" that lived there. For another thing, Sergeant Heslam testified that when law enforcement executed the search warrant in that apartment, the defendant alone was home and only one bedroom was furnished. In that bedroom, the officers retrieved Phone #3 and a jewelry receipt identifying the defendant as the buyer and listing Phone #3 as his phone number.

- 15 -

Given all this evidence, a rational factfinder could have found, beyond a reasonable doubt, that Phone #3 belonged to the defendant and, thus, that the defendant was Guy — the fentanyl seller who coordinated the September 19 controlled buy. Because the verdict on this count is supported by the record, the evidence was sufficient to convict the defendant on count six.

**2.** Counts two, four, and five. With respect to the convictions stemming from the May 21, July 31, and August 6 controlled buys arranged through Phones #1 and #2, the defendant argues that there was "no direct evidence" proving that he possessed either phone. He points out that neither phone was recovered and that the "mere fact" that Phone #3 was found in the apartment where he was arrested is insufficient to establish that he possessed Phones #1 and #2. We do not agree.

"Direct evidence . . . is not essential to ground a conviction; circumstantial evidence alone may suffice." Concepcion-Guliam, 62 F.4th at 34. The circumstantial evidence that the government adduced here was multifaceted and sufficient to lead a rational factfinder to conclude, beyond a reasonable doubt, that Phones #1 and #2 belonged to the defendant and, as such, that the defendant was the fentanyl seller who coordinated the three controlled buys by way of these phones.

At trial, the government proffered testimony from both Sergeant Larkin and Roy that the controlled buy for May 21 was

coordinated using Phone #1 and the buys for July 31 and August 6 were coordinated using Phone #2. The government also introduced into evidence an extraction report linking those two phones to Phone #3 and showing that all three phones were used by the same individual.

There was more. The government introduced evidence of surveillance observations and ping location data which placed the defendant and Phone #2 at the same location on August 15. The defendant's argument that the area that Sergeant Heslam surveilled that day was "densely populated" is unavailing. Defense counsel twice asked Sergeant Heslam — in cross-examination — whether he agreed that the area surveilled "is a densely populated residential area." Sergeant Heslam responded in the affirmative both times. The jury thus knew that the area surveilled, indeed all of Lawrence (as per Sergeant Heslam's own testimony), was densely populated. And it was their "responsibility to weigh the evidence in its totality, resolve contradictions in the facts, and gauge the credibility of the witnesses." United States v. Didonna, 866 F.3d 40, 48 (1st Cir. 2017).

The defendant attempts to blunt the force of the evidence by arguing that the government did not "prove that [he] possessed the phones and used them on the dates of offense." But the evidence proved precisely that — albeit through circumstantial evidence. Sergeant Larkin's testimony, Roy's testimony, and the extraction

report linked the three phones. Sergeant Heslam's testimony pinned the defendant to Phone #2. Other testimony — namely, Officer Moynihan's testimony, the recovery of Phone #3, and the jewelry receipt — pinned the defendant to Phone #3. Based on this evidence, a rational factfinder could conclude, beyond a reasonable doubt, that the defendant possessed Phones #1 and #2 on the dates in question and that the defendant was Guy, the unidentified fentanyl seller.

**3.** Count three. With respect to the conviction stemming from the July 10 controlled buy, the defendant argues that the evidence is insufficient to ground his conviction on count three because Lara's testimony is "deeply flawed." The defendant asserts that Lara's testimony is "deeply flawed" due to inconsistent statements he allegedly made about "core facts."

At trial, Lara testified that — on July 10 — the defendant called him to meet the defendant outside a store. There, the defendant (Lara stated) gave him fentanyl to deliver to a buyer, Roy. After completing the sale, he — Lara testified — met the defendant to give the defendant Roy's payment. Lara also testified that prior to that, the defendant called him about six times to pick up smaller quantities of fentanyl from another individual (Gordo). However, on November 20, 2019, Lara met with law enforcement agents to give a proffer, and there, he made no

mention of Gordo.  The defendant argues that this inconsistency renders the totality of Lara's testimony "deeply flawed."

It is well-settled, though, that in examining a sufficiency-of-the-evidence claim, an appellate court is to refrain from making any credibility judgments.  See United States v. Chan, 981 F.3d 39, 55 (1st Cir. 2020); United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015); United States v. Sherman, 551 F.3d 45, 49 (1st Cir. 2008).  We have stated that "a defendant cannot win a sufficiency-of-the-evidence challenge by claiming . . . the witnesses against him were not credible." United States v. Maldonado-Peña, 4 F.4th 1, 54 (1st Cir. 2021). "[I]t is not our prerogative to make independent assessments of witness credibility.  Rather, we must 'resolve[] all credibility issues in favor of the verdict.'"  United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021) (second alteration in original) (citation omitted) (quoting United States v. Andújar, 49 F.3d 16, 20 (1st Cir. 1995)).

Here, the alleged inconsistency did not relate to the July 10 controlled buy.  It related to fentanyl sales before July 10, and the jury was made aware of the contradiction.  The jury may have chosen either to disregard Lara's testimony entirely and to rely only on the remainder of the evidence or to consider some portions of Lara's testimony credible and to disregard contradictory parts.  There was no error in either approach:

"credibility determinations are for the jury." United States v. Alicea, 205 F.3d 480, 483 (1st Cir. 2000). And the "jury has the prerogative to credit some parts of a witness's testimony and disregard other potentially contradictory portions." Id.

Considering the totality of the evidence as to count three — that is, Sergeant Larkin's testimony, Roy's testimony, Sergeant Heslam's testimony, the extraction report, and Lara's testimony — we hold that the evidence presented at trial established that a rational factfinder could conclude, beyond a reasonable doubt, that the defendant was guilty of count three. In other words, the record supports the jury's verdict as to count three.

**4.** Count one. We turn last to the conspiracy conviction. The defendant's principal argument here is that the government failed to identify the runners and to prove, beyond a reasonable doubt, that they possessed the intent both to agree to the conspiracy and to commit the underlying crime. It is possible, the defendant says, that the runners did not even know that they were delivering drugs to Roy. Without proving the runners' intent, the defendant continues, the government is unable to prove that the defendant engaged in a conspiracy.

To begin, the government did not have to identify all the runners in order to prove a conspiracy. See United States v. Nason, 9 F.3d 155, 159 (1st Cir. 1993). "The essence of a

conspiracy is the existence of the conspiracy agreement, not the identity of those who agree." Id. To prove the existence of a conspiracy agreement, the government may rely on inferences based on the unidentified runners' actions. See United States v. Santos-Soto, 799 F.3d 49, 57-58 (1st Cir. 2015).

In this case, the government adduced evidence that could support a reasonable inference that the unidentified runners possessed the requisite intent: the surreptitious nature of the deliveries, the locations of the deliveries, the defendant's willingness to pay for each delivery, the size, weight, and packaging of the drugs, and the payment given in exchange for the packages. Roy testified at trial that he picked up all the fentanyl purchases in the Methuen, Lawrence area. He stated that the exchanges were "quick handoff[s]" to ensure that "everybody [gets] in and out safely" and that law enforcement (or residents who may call the police) do not notice. In addition, several of the exhibits introduced during Sergeant Larkin's testimony were photographs of the drugs retrieved from the runners. The photographs show small cylinders packed in clear plastic bags, which Roy testified were "rock hard."

"[J]uries are not required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its

constituent parts.'"  United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992) (quoting Bourjaily v. United States, 483 U.S. 171, 179-80 (1987)).  So it was here:  the totality of the evidence presented at trial established that a rational factfinder could conclude, beyond a reasonable doubt, that the defendant was guilty of conspiracy.

## III

We need go no further.  For the reasons elucidated above, the district court's denial of the defendant's motions to suppress and denial of his motions for judgment of acquittal are

**Affirmed**.