# United States Court of Appeals
## For the First Circuit

No. 23-1456

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY BASILICI,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Gelpí, Lynch, and Howard,
Circuit Judges.

Randall E. Kromm, Assistant United States Attorney, with whom Joshua S. Levy, Acting United States Attorney, was on brief, for appellee.

William L. Welch, III for appellant.

May 23, 2025

**GELPÍ**, **Circuit Judge**. Anthony Basilici ("Basilici") was convicted by a jury of conspiring with others in 2018 and 2019 to possess with intent to distribute heroin, to commit kidnapping with co-conspirators Edwin Otero ("Otero") and Justin Joseph ("Joseph"), and to obstruct justice with Otero. He was also convicted along with Otero and Joseph of possession of a firearm in furtherance of a drug trafficking crime, said firearm being discharged, triggering an enhanced ten-year consecutive sentence. In this appeal, Basilici challenges only his firearm conviction under Count Five, alleging various trial errors and positing the evidence was insufficient.

In Pinkerton v. United States, the Supreme Court held that parties to a conspiracy may be held responsible for reasonably foreseeable crimes committed by their co-conspirators in furtherance of the conspiracy. 328 U.S. 640, 647-48 (1946). In this case, Basilici asserts error under the Pinkerton doctrine connected with the jury instructions. In challenging the sufficiency of the evidence for Count Five, Basilici contends that it was not reasonably foreseeable to him that one of his co-conspirators would have discharged the firearm.

He also submits that the Pinkerton instruction and the court's supplemental instruction in response to a jury question were misleading and confusing, thus affecting his substantial rights. And so, he urges this court to vacate his firearm

discharge conviction ("Count Five"). Because neither the law nor the record supports Basilici's contentions, we **affirm**.

## I. BACKGROUND

### A. Facts

We summarize and recite the relevant facts in light most favorable to the jury's verdict, see United States v. Carmona, 103 F.4th 83, 91 (1st Cir. 2024), and recount the procedural course of this case. Basilici's charges resulted from his association with Otero, the leader of a drug-trafficking organization of which Basilici was a member. In 2018, the Drug Enforcement Administration and the Barnstable Police Department (collectively, "law enforcement") began investigating Otero for his involvement in heroin distribution. After obtaining a wiretap order and installing a pole camera in front of Otero's residence, law enforcement collected incriminating evidence against Otero and his associates, including Basilici. This evidence, along with the testimony at trial, revealed Basilici and Otero's involvement in, among other things, a drug trafficking conspiracy and the non-fatal shooting of Krymeii Fray ("Fray"). The evidence, including a video recording, also depicted Basilici's participation in the April 10, 2019, kidnapping and assault of Bruce Owens ("Owens"). The recording showed that, during that assault, Otero threatened Owens with a gun. Investigators identified Basilici as the person who recorded the assault based on his tattoos, which are shown in the

video. Basilici's kidnapping and obstruction charges, Counts Nine, Ten, and Eleven -- which are not contested in this appeal -- resulted from his participation in the Owens events.

1.   The Drug Trafficking Conspiracy

Otero, Joseph, and Basilici lived in the same apartment building at 49 Grotto Avenue, Pawtucket, Rhode Island (the "Pawtucket Apartment"). Between April 24 and April 26, 2019, Joseph exchanged messages with a customer about the sale of "brown," a slang term for heroin. Two days later, Joseph asked Basilici if he was familiar with Humbolt Street, a street close to the Pawtucket Apartment, to which Basilici responded in the affirmative. Joseph then told him to "go there for that kid" and referred to "1 CD," which investigators understood to be heroin. The customer then texted Joseph "here," and Joseph responded that he would be there in two minutes. After that exchange, footage from the pole camera outside the Pawtucket Apartment showed Basilici exiting his apartment and walking towards Humbolt Street. Soon after, the customer texted Joseph, complaining about the amount of heroin he had received, asking "[w]hy you only giving so little usually you hook me up I got 70."

Then in a phone conversation on April 30, Basilici asked Otero if the Pawtucket Apartment was clean. Law enforcement understood that question as Basilici asking whether the Pawtucket Apartment was free from contraband. Otero answered that the house

- 4 -

was not clean. Basilici then texted Otero that there were police officers in the neighborhood and sent pictures of them. Frustrated with the possibility he was being investigated, Otero stated in a call later that same day: "they snitching on our house," meaning that someone was relaying to the police that the Pawtucket Apartment was linked to criminal activity.[1]

## 2. The Fray Shooting

A little over a week later, on May 8, a shooting took place at Fray's house. Fray bought heroin from Otero on consignment to then sell to other people. Before that shooting, Otero had given Fray 100 grams of heroin, charging him $6,000. As was customary between them, Fray did not pay Otero immediately, since Otero understood that Fray would pay him once he had sold the heroin. But after selling the drugs, Fray only paid a fraction of what he owed to Otero, causing Otero to grow impatient.

Several weeks later, on May 3, 2019, Otero, in a phone conversation with Fray, expressed frustration that Fray had not paid him. The situation escalated further after that phone call, when Otero texted Fray that Otero's drug suppliers wanted their money and "were acting wild." Then a few days later, on May 7,

---

[1] In connection with this communication and upon seizing Basilici's phone after concluding the investigation, investigators found videos from April 30 where Basilici called in license plates to vehicles he thought were unmarked police cars.

the situation escalated even more, with both men threatening each other.

From Otero's messages, law enforcement knew that the situation between Fray and Otero had gone sideways. So, the next day, agents began conducting surveillance near an apartment complex where Otero's mother lived. One observed that a Honda Accord belonging to Otero's girlfriend drove towards Fray's home. Sensing that something would happen, he left the area and informed Sergeant Mark Butler of the situation. As Sergeant Butler drove to Fray's home, Fray, who was outside of his house looking for his phone, was attacked by two men wearing masks. As the assault unfolded, Fray got one of the attackers on the ground. That attacker was Otero. Otero then started screaming "kill him, kill him," and the other man, who Owens later identified as Joseph, raised a gun and fired at Fray, with the bullet passing by Fray's head.

After receiving reports of the gunshot, Barnstable Police Sergeant Kevin Fullam ("Fullam") went to Fray's home to investigate the situation. Once there, Fullam observed that Fray was out of breath, with debris in his hair, and a stretched-out shirt. Fray denied hearing the gunshot. But the officer did not believe him. On his way back to the car, Fullam saw a firearm magazine in front of a house directly next to Fray's property.

The same was later seized and used as evidence of the Fray shooting at trial.

Soon after the shooting, law enforcement learned that the Honda Accord previously seen at the Fray shooting scene was near the residence of Eric Brando ("Brando"), one of Otero's associates. Police officers then went to Brando's neighborhood and discovered the Honda Accord crashed into the woods nearby. In the hours that followed, intercepted calls between Otero, Basilici, Joseph, and others revealed that in the wake of the Fray shooting, Basilici was hiding in the woods behind Brando's house, believing that law enforcement officers were looking for him.

On May 10, investigators intercepted another call between Basilici and Otero and discovered that Basilici also had a gun at the time of the Fray shooting. In the intercepted call, Otero and Basilici discussed the place where Basilici threw the gun he had on the day of the shooting. In describing where he disposed of the gun, Basilici implied that he had gotten rid of it as he left the shooting scene on Lefrance Avenue, the street where Fray's house is located. He also suggested that he could send someone to look for the gun, but Otero discouraged it. Several days later, on May 20, law enforcement officers arrested Otero, Basilici, and their associates, on the federal charges levied against Basilici.

## B. Procedural History

On March 11, 2020, a federal grand jury returned a superseding indictment against Basilici and others, charging him with the crimes described earlier.[2] Basilici initially pled guilty to all counts. But about two weeks before his sentencing, he withdrew his guilty plea and proceeded to trial. His co-conspirators pled guilty, and some testified against him.

At trial, the government requested a <u>Pinkerton</u> instruction. After the prosecution rested, Basilici objected to the giving of such jury instruction, contending that the evidence failed to show his presence at the Fray shooting or that he could foresee that Joseph would discharge a firearm. The district court heard arguments and decided to "leave the charge in." In its instructions to the jury, the court explained that there were "two methods by which [the jury] may evaluate whether to find the defendant guilty of Count Five":

---

[2] The superseding indictment charged Basilici with the following: (1) Count One: Conspiring to distribute and to possess with intent to distribute 100 grams or more of heroin in violation of 21 U.S.C. § 846; (2) Count Five: Possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A) and (c)(1)(A)(iii); (3) Count Nine: Conspiring to commit kidnapping in violation of 18 U.S.C. § 1201(c); (4) Count Ten: Conspiring to obstruct justice by retaliating against a witness, victim, or informant in violation of 18 U.S.C. § 1513(f); and (5) Count Eleven: Obstructing justice and aiding and abetting the obstruction of justice by tampering with a witness, victim, or informant by physical force or threat in violation of 18 U.S.C. § 1512(a)(2)(c).

First, you could find that the government has proved beyond a reasonable doubt that the defendant actually or constructively possessed the firearm in furtherance of the drug trafficking conspiracy alleged in Count One. Second, you could also find the defendant guilty if you find each of the following five elements were proven beyond a reasonable doubt: One, that someone committed the substantive crime charged in Count Five, that is, that someone possessed a firearm in furtherance of a drug trafficking crime; two, that the person you find actually committed the charged substantive crime was a member of the same conspiracy as you found proven against the defendant; three, that this co-conspirator committed the charged substantive crime in furtherance of that conspiracy; four, that the defendant was a member of this conspiracy at the time the charged substantive crime was committed and had not withdrawn from it; and five, that the defendant could reasonably have foreseen as the necessary or natural consequence of the unlawful agreement that one or more of his co-conspirators would commit the charged substantive crime.

If you find all five of these elements proven beyond a reasonable doubt, then you may find the defendant guilty of possessing the firearm in furtherance of a drug trafficking crime as charged in Count Five, even though he did not personally participate in the acts constituting the crime or have actual knowledge of them. In other words, so long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of a drug trafficking conspiracy and that this was reasonably foreseeable to the defendant, the defendant can be held liable as if he himself carried or used the firearm. If, however, you are not satisfied as to the existence of any one of these five elements, then you may not find the defendant guilty of this particular substantive crime unless the government proves beyond a reasonable doubt that he personally possessed a firearm in furtherance of the drug trafficking conspiracy charged in Count One. If you decide that the defendant is guilty of possessing a firearm in furtherance of a drug trafficking crime, you must next decide whether the firearm was discharged. Discharged does not require intent but can be accidental.

(Emphasis added). Basilici's counsel did not object to the language of the given instruction other than to note that the district court used the words "using or carrying in furtherance" instead of "possession in furtherance," but even as to that objection, counsel said "I don't think that's an issue, but I did want to flag it."

After deliberating for just under two hours, the jury sent the district court a note asking the judge to clarify the phrase "could reasonably have foreseen" that as a necessary or natural consequence of the unlawful agreement, one or more of Basilici's co-conspirators would commit the charged substantive crime under Count Five. To answer the jury's question, the district court proposed a supplemental instruction, defining "reasonably foreseeable" as the ability to anticipate that a co-conspirator would possess a firearm in furtherance of the drug conspiracy. Basilici's counsel disagreed with the proposed instruction, and it was not given. Rather, the court discussed with counsel at length the definition of "could reasonably have foreseen," and after amending the proposed supplemental instruction multiple times with input from both parties, all agreed on an appropriate wording: "In context -- that at some point after the Defendant joined the conspiracy charged in count 1, a co-conspirator's possession of a firearm on May 8 was reasonably foreseeable to the Defendant and in furtherance of the conspiracy."

- 10 -

The judge wrote the supplemental instruction on a piece of paper, to which she taped the note with the jury's question. Because the jury had left the courtroom for the day, the judge instructed the courtroom clerk to "leave the note on the table" in the deliberation room, and then to inform the jury about it the next morning. Basilici's counsel did not object. Neither the jury's note nor the court's supplemental instruction were marked as exhibits before the verdict. The jury ultimately found Basilici guilty on all counts.

Basilici then renewed his motion for acquittal as to Counts Five, Nine, and Ten, arguing that the evidence was insufficient to support a guilty verdict on those counts. He also filed a motion for a new trial. The court denied both motions, holding that the jury had ample evidence to convict Basilici on those counts.

On November 15, 2024, after trial, the district court granted Basilici's Motion to Correct the Record and marked and entered the paper with the jury note and the court's response as an exhibit.

Basilici appealed his conviction as to Count Five.

## II. DISCUSSION

Basilici advances three overarching arguments, which, he insists, warrant dismissal of Count Five: (1) the evidence was insufficient to both charge the jury with a Pinkerton instruction

- 11 -

and convict him under <u>Pinkerton</u> liability; (2) the original <u>Pinkerton</u> instruction was misleading and confusing, and failed to comply with First Circuit pattern instructions, affecting his substantial rights; and (3) the supplemental <u>Pinkerton</u> instruction relieved the government of its burden and the judge failed to follow the proper procedure in giving that instruction because she did not, but should have, marked the jury's note as an exhibit and read the supplemental instruction into the record in the presence of the jury.  We address each argument *seriatim*.

## A.  Denial of the Rule 29 Motion and Sufficiency of the Evidence

"Because insufficiency claims are commonplace in criminal appeals, the standard of appellate oversight lends itself to rote recitation."  <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1173 (1st Cir. 1993).  In reviewing preserved challenges to the sufficiency of the evidence, we review the record below de novo, "appraising the proof in the light most favorable to the verdict," and consider "both direct and circumstantial evidence."  <u>United States</u> v. <u>Rodríguez-Vélez</u>, 597 F.3d 32, 38 (1st Cir. 2010) (citing <u>United States</u> v. <u>Stierhoff</u>, 549 F.3d 19, 26 (1st Cir. 2008)).  "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved <u>all</u> the essential elements of the charged crime beyond a reasonable doubt."  <u>Id.</u> at 39 (citing <u>United States</u> v. <u>O'Brien</u>, 14 F.3d 703, 706 (1st Cir. 1994)).  "In the end, we 'need not be convinced that the

verdict is correct; [we] need only be satisfied that the verdict is supported by the record.'" Carmona, 103 F.4th at 91 (alteration in original) (quoting United States v. Kilmartin, 944 F.3d 315, 325 (1st Cir. 2019)). A defendant challenging a conviction for insufficiency of evidence therefore "face[s] an uphill battle on appeal." United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000).

18 U.S.C. § 924(c)(1)(A) penalizes an individual who "in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm . . . in furtherance of any such crime" and that the firearm possessed was discharged.[3] "Under Pinkerton, a defendant is 'criminally liable for the substantive offenses committed by his co-conspirators during the course of and in furtherance of the conspiracy,' so long as the offenses could be 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" United States v. Salvador-Gutierrez, 128 F.4th 299, 309 (1st Cir. 2025) (en banc) (emphasis added) (first quoting United States v. Hansen, 434 F.3d 92, 103 (1st Cir. 2006); and then quoting Pinkerton, 328 U.S. at 648).

---

[3] The jury's verdict not only found Basilici guilty of "possessing a firearm in furtherance of the drug trafficking conspiracy" but also "that the firearm possessed was discharged." That shows that the jury in fact relied on the Pinkerton theory to find Basilici guilty of Count Five.

Basilici asserts, and the government agrees, that there is no evidence he himself discharged a firearm in connection with the Fray shooting. His appeal therefore centers around whether there was sufficient evidence for the jury to convict him of Count Five based on a Pinkerton theory of liability. While Basilici concedes he was a conspirator as to all of the other conspiracies charged, he asserts that it was not reasonably foreseeable to him that a firearm would be discharged during the Fray shooting. In so arguing, he raises the seldomly effective argument that the verdict relied on stacking inference upon inference. The argument is inapplicable here, and we discourage such amiss usage prospectively.

The meaning of reasonable foreseeability is "broader than knowledge." United States v. Ford, 73 F.4th 57, 66 (1st. Cir. 2023) (citations omitted). In the criminal legal context, "[w]hether a particular substantive crime is foreseeable and in furtherance of the conspiracy is a factual question to be determined by the jury." United States v. Bruno, 873 F.2d 555, 560 (2d Cir. 1989). Relevant factors in this inquiry include the nature of the underlying conspiracy and antecedent circumstances indicating to a reasonable person that any co-conspirator may engage in the crime at issue to advance the predicate conspiracy. See United States v. Rijos-Rivera, 53 F.4th 704, 709 (1st Cir. 2022) (holding "that [an] abduction was reasonably foreseeable to

- 14 -

the defendant" because of "what had gone before and the nature and circumstances of the offense of conviction . . . .").

A jury could readily conclude Basilici reasonably foresaw that in the course of Fray's beating, Joseph could discharge a firearm for a number of reasons foreseeable to him. The evidence amply supports the finding that Basilici was present at the Fray shooting. Although Fray testified that Joseph and Otero were the ones who assaulted him, evidence presented at trial revealed that Basilici was with Joseph and Otero at the shooting. For instance, law enforcement officers observed the Honda Accord belonging to Otero's girlfriend driving on Fray's street prior to and during the shooting, establishing that at least one other person had traveled with Otero and Joseph. After gunshots were heard, the Honda Accord was seen fleeing the scene and ultimately found crashed in the woods in Osterville where Basilici admitted being hiding after the incident. In an intercepted call between Otero and Basilici after the shooting, Basilici also stated: "When that shit was going on I was just . . . looking behind me fucking making sure they're behind us yet," which law enforcement interpreted to mean Basilici had thrown his gun out of the car and wanted to make sure it was left behind. Moreover, Basilici told Otero where he allegedly had disposed of the gun after the shooting and that he took measures to avoid arrest, such as changing his phone number. A jury, therefore, could readily infer that Basilici

was present at the shooting scene. See Ortiz, 966 F.2d at 713 ("The key is whether the jury's decipherment of the record represented a plausible choice among reasonable alternatives, all things considered.").

Further, the nature of a heroin conspiracy commonly involves the use of firearms. See United States v. Rodríguez, 735 F.3d 1, 9 (1st Cir. 2013). Even more so here, given the assault on Fray. "[F]irearms are common tools of the drug trade." United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991). The "illegal drug industry is, to put it mildly, a dangerous, violent business." Rodríguez, 735 F.3d at 9 (citation omitted). Indeed, "[f]irearms are often used by drug dealers to protect drug stockpiles, to preempt encroachment into a dealer's 'territory' by rival dealers," and to retaliate against perceived enemies. United States v. Vazquez-Castro, 640 F.3d 19, 26 (1st Cir. 2011) (quoting United States v. Luciano, 329 F.3d 1, 6 (1st Cir. 2003)). "[A] codefendant's possession [and discharge] of a dangerous weapon is foreseeable to a defendant with reason to believe that their collaborative criminal venture includes an exchange of controlled substances . . . ." Bianco, 922 F.2d at 912.

The evidence also supported the jury verdict that the Fray shooting was reasonably foreseeable to Basilici because there were firearms in the car as Basilici, Otero, and Joseph went to encounter Fray, and Basilici knew Otero used violence and guns

- 16 -

from Owen's earlier kidnapping in which Otero displayed a firearm. A jury could reasonably infer that Basilici assisted Otero and Joseph in roughing up Fray -- an inherently dangerous endeavor which "might go awry and result in physical violence." See Serrano-Delgado, 29 F.4th at 26 (citation omitted).

We explain why we readily reject Basilici's improper "inference stacking" argument. His argument misreads United States v. Guzman-Ortiz, 975 F.3d 43 (1st Cir. 2020), which referred to whether a proposition "follows from the underlying facts." Id. at 55. "The rule that prohibits the stacking of inference upon inference merely indicates that at some point along a rational continuum, inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion." United States v. Summers, 414 F.3d 1287, 1295 (10th Cir. 2005). "[T]he chance of error or speculation increases in proportion to the width of the gap between underlying fact and ultimate conclusion where the gap is bridged by a succession of inferences, each based upon the preceding one." Id. (quoting United States v. Shahane, 517 F.2d 1173, 1178 (8th Cir. 1975)); see also United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995) (noting the need to provide direct or circumstantial evidence to support a charge).

Here, far from stacking impermissible inferences, the jury drew common-sense inferences from the evidence. Intercepted

phone calls provided evidence that Basilici was present at the shooting scene. Basilici said to Otero: "When that shit was going on I was just . . . looking behind me fucking making sure they're behind us yet." He also told Otero where he had thrown the gun after the Fray shooting. Further, a trier of fact need not have direct evidence to convict a defendant, for "circumstantial evidence alone may suffice." Carmona, 103 F.4th at 92 (citation omitted). Circumstantial evidence "asserts something else from which the trier of fact may either (i) reasonably infer the truth of the proposition or (ii) at least reasonably infer an increase in the probability that the proposition is in fact true." United States v. Patel, 370 F.3d 108, 113 (1st Cir. 2004) (quoting United States v. Ruiz, 105 F.3d 1492, 1500 (1st Cir. 1997)). There is ample direct and circumstantial evidence that (1) Basilici arrived with firearms at the shooting scene with Otero and Joseph; (2) guns were used at the time; (3) Basilici disposed of a gun shortly after the shooting; and (4) he hid in the woods intending to avoid arrest. The jury could easily draw the common-sense inference that the guns brought to and discharged at the Fray shooting would be used for more than just show.

## B. Arguments Concerning Pinkerton Instruction

Our conclusion that the jury had before it sufficient evidence under Pinkerton disposes of the argument that the evidence was insufficient to support the judge giving a Pinkerton charge.

Indeed, as said, Basilici conceded at oral argument that he was a co-conspirator.

At trial, Basilici did not object as to the language of the _Pinkerton_ instruction, nor did he argue that the instruction confused or misled the jury. We therefore review these contentions for plain error. _See_ Fed. R. Crim. P. 30 (establishing that a party objecting to any portion of a jury instruction "must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate").

This court has cautioned that "the plain error hurdle is high." _United States_ v. _Hunnewell_, 891 F.2d 955, 956 (1st Cir. 1989). "Nowhere is this hurdle higher than in instances in which an appellant relies on a claim of instructional error; in such instances, reversals are hen's-teeth rare." _Teixeira_ v. _Town of Coventry_, 882 F.3d 13, 18 (1st Cir. 2008) (citing _United States_ v. _Paniagua-Ramos_, 251 F.3d 242, 246 (1st Cir. 2001)). "This hard-to-achieve standard makes good sense: timely and specific objections to jury instructions 'enable a trial court to correct any . . . mistakes before the jury retires' and, thus, avoid the necessity for a costly retrial." _Id._ (quoting _Jones_ v. _United States_, 527 U.S. 373, 387-88 (1999).

Under this rigorous standard, Basilici "must show (1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also

- 19 -

(4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." See United States v. Burgos-Balbuena, 113 F.4th 112, 118 (1st Cir. 2024) (cleaned up) (citations omitted).

Basilici argues that the court erred in deviating from the First Circuit pattern instructions in failing to include the burden of proof by omitting the statement that the "jury may, but is not required to, find [Basilici] guilty of the substantive crime charged in Count [Five]." See e.g., Pattern Jury Instructions for the District Courts of the First Circuit § 4.18.371(2); see also United States Latorre-Cacho, 874 F.3d 299, 302 (1st Cir. 2017) ("[J]ury instructions may violate a defendant's constitutional right to due process if they relieve the government of its obligation to meet that requirement"). As a result, Basilici asserts, this omission misled the jury, created confusion, and violated his constitutional rights. Not so.

Time and again, we have said that trial courts are not bound by pattern jury instructions. See Teixeira, 882 F.3d at 18 (stating that although pattern instructions are helpful, they are not legally binding). They are "merely an informal guide, which 'does not in any way curtail' the 'wide discretion' enjoyed by a district court to 'instruct in language that it deems most likely to ensure effective communication with jurors.'" Id. (quoting United States v. Gomez, 255 F.3d 31, 39 n.7 (1st Cir. 2001)). For

that reason, the district court did not err in failing to include in its instructions precise language from the pattern instruction.

There was no error at all. The district court did not in any way relieve the government of its burden of proof, as the jury had been previously instructed.[4] It was within the court's considerable discretion whether to reemphasize again the government's burden of proof.[5]

As to the supplemental Pinkerton instruction responding to the jury's question, Basilici again argues that it "relieved the government of its burden on Count Five," this time because it "did not include an instruction to consider the response with all the instructions previously given." This argument, too, falls flat.

---

[4] The original Pinkerton instruction the court gave to the jury states that the jury "could find that the government has proved beyond a reasonable doubt that the defendant actually or constructively possessed the firearm in furtherance of the drug trafficking conspiracy alleged in Count One." (emphasis added). The instruction also mentioned that, alternatively, the jury "could also find the defendant guilty" if the five Pinkerton elements "were proven beyond a reasonable doubt." (emphasis added). "[S]o long as there is sufficient evidence that a co-conspirator carried or used a firearm in furtherance of a drug trafficking conspiracy and that this was reasonably foreseeable to the defendant . . . [the jury] may find the defendant guilty of possessing the firearm in furtherance of a drug trafficking crime as charged in Count Five." (emphasis added).

[5] Basilici makes one more futile argument about the original Pinkerton instruction given -- that it confused the jury as evidenced by its request for clarification. To the extent this argument is not waived for lack of development, we reject it, for it is not supported by any legal authority.

During deliberation, juries often seek to clarify certain aspects of the court's instructions. It is at the district judge's discretion whether to re-instruct the jury to address the jury's question. See United States v. Parent, 954 F.2d 23, 25 (1st Cir. 1992) ("[T]he giving, or withholding, of a supplemental instruction, or the contents of it if given, are matters committed to the trial court's sound discretion"). Here, after receiving the jury's note, the court spent significant time drafting a supplemental instruction defining the meaning of "reasonably foreseeable," with active input from both the prosecution and Basilici's counsel. Before the response was sent to the jury, Basilici did not object to it. Indeed, the court asked Basilici's counsel if he wanted to look at the finished product, to which counsel replied: "No, I'm fine with it, too, as long as it's clear."

Although counsel participated in the drafting of the supplemental instruction, Basilici now argues that the supplemental instruction "did not include an instruction to consider the response with all the instructions previously given" and so "relieved the government of its burden on Count Five." But he forfeited that argument. See P.R. Hosp. Supply, Inc. v. Bos. Sci. Corp., 426 F.3d 503, 505 (1st. Cir. 2005); see also Serrano-Delgado, 29 F.4th at 29.

Finally, Basilici challenges the way in which the court handled the supplemental jury instruction but failed to object below. So review is for plain error. See United States v. Dickerson, 514 F.3d 60, 63 (1st Cir. 2008) (citations omitted).

He argues that reversal is warranted for two reasons: (1) because the district court left the supplemental instruction in the deliberating room rather than reading it out loud in front of the jury, and (2) because the court failed to mark the jury's note as an exhibit. Neither contention amounts to reversal.

No precedent mandates that the note be read out loud in front of the jury rather than left in the deliberating room. In United States v. Maraj, 947 F.2d 520 (1st Cir. 1991), we outlined four steps for how trial judges should handle communication with the jury during deliberation: "(1) the jury's communique should be reduced to writing; (2) the note should be marked as an exhibit for identification; (3) it should be shown, or read fully, to counsel; and (4) counsel should be given an opportunity to suggest an appropriate rejoinder." Id. at 525 (emphasis added). "[W]here the judge favors a written response to such a note, the lawyers should review the intended reply and 'be afforded an opportunity to register objections before the reply is transmitted to the jury.'" Parent, 954 F.2d at 25 (quoting Maraj, 947 F.2d at 525); see also Shields v. United States, 273 U.S. 583, 588 (1927) ("Where a jury has retired to consider its verdict, and supplementary

- 23 -

instructions are required, . . . they ought to be given [] in the presence of counsel . . . ; and written instructions ought not to be sent to the jury without notice to counsel and an opportunity to object." (quoting Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 81 (1919)).

The court here responded to the jury's note in writing. Basilici's counsel took an active role in its crafting, thereby having the opportunity to suggest rejoinder. Indeed, the district court satisfied Basilici's request. And, after the court crafted the revised answer, it read it out loud in front of Basilici's counsel, thus following Maraj's third step.

That the note was not marked as an exhibit before the verdict was harmless. The jury would not have been aware of that, and the outcome of the case would have been identical.

### III. CONCLUSION

For the reasons discussed above, we reject Basilici's arguments and **<u>affirm</u>** his conviction as to Count Five.